UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **GAILEN LEE DAVID,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | Case No.: _____ |
| **EN POINTE PRODUCTIONS LLC,** | ) | |
| | ) | |
| **DEVIANT ENTERTAINMENT, LLC,** | ) | |
| | ) | |
| **GORGON LLC,** | ) | |
| | ) | |
| **MORE NEWS LATER MEDIA, LLC,** | ) | |
| | ) | |
| **NIKKI NUTRITION, L.L.C,** | ) | |
| | ) | |
| **PRESTIGE BUSINESS SOLUTIONS, LLC,** | ) | |
| | ) | |
| **ON IT MEDIA LLC,** | ) | |
| | ) | |
| **APRIL D. CARTER,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **KENNETH J. FIELDS,** | ) | |
| | ) | |
| **CARRIE A. GROENWOLD (aka CARRIE A. KENNEDY),** | ) | |
| | ) | |
| **JOAN G. JONES** | ) | |
| | ) | |
| **ROBERT E. LAURIE,** | ) | |
| | ) | |
| **JUAN CARLOS ALBARRÁN MÁRQUEZ,** | ) | |
| | ) | |
| **NICOLE C. NOYA,** | ) | |
| | ) | |
| **JAIME VALVERDE,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **DOES 1 THROUGH 15** | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## COMPLAINT

**COMES NOW** Plaintiff GAILEN LEE DAVID (hereinafter "DAVID" or "Plaintiff"), by and through undersigned counsel, and for his Complaint against Defendants EN POINTE PRODUCTIONS LLC, DEVIANT ENTERTAINMENT, LLC, GORGON LLC, MORE NEWS LATER MEDIA, LLC, NIKKI NUTRITION L.L.C, ON IT MEDIA LLC, PRESTIGE BUSINESS SOLUTIONS, LLC, KENNETH J. FIELDS, CARRIE A. GROENWOLD (aka CARRIE A. KENNEDY), NICOLE C. NOYA, JOAN G. JONES, ROBERT E. LAURIE, APRIL D. CARTER, JUAN CARLOS ALBERRÁN MÁRQUEZ, JAIME VALVERDE, and JOHN DOES 1 through 15 (collectively the "Defendants") and respectfully submits the following:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

2. This Court has original jurisdiction under 28 U.S.C. § 1331, because it presents a question of federal law.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the Plaintiff is a resident of Florida, and the known Defendants all reside in California, Delaware, District of Columbia, Florida, Maryland, Nevada, Michigan, and/or Virginia, and the amount in controversy exceeds $75,000.00.

4. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and many of the Defendants reside within 100 miles of the Eastern District of Virginia.

## PARTIES

5.    Plaintiff DAVID is a U.S. Citizen with a TWENTY-FIVE PERCENT (25%) Member-Manager ownership stake in EN POINTE PRODUCTIONS LLC, residing at 3845 Coco Grove Avenue, Coconut Grove, Florida 33133.

6.    Plaintiff is a Member and FIFTY-ONE PERCENT (51%) owner of AIROPLEX, LLC (hereinafter "AIROPLEX"), a Florida Limited Liability Company, formed March 21, 2020, with a principal address of 3845 Coco Grove Avenue, Coconut Grove, Florida 33133.

7.    Additionally, the Plaintiff, under the AIROPLEX umbrella, owns and operates a travel etiquette website, Jetiquette (hereinafter "JETIQUETTE"), located at jetiquette.org.

8.    Defendant EN POINTE PRODUCTIONS LLC (hereinafter "EPP") is a Nevada Limited Liability Company with principal office addresses located at 107 South West Street, Suite 136, Alexandria, Virginia 22314 and 45915 Maries Road, Unit 138, Sterling, Virginia 20166.

9.    Although Defendant EPP claims the business address of its Nevada registered agent, GG International, at 6628 Sky Pointe Drive, Suite 129, Las Vegas, Nevada 89131, it conducts all its business and operations in Virginia, and has done so since its formation on October 16, 2015.

10.    EPP has no employees or officers located in Nevada, and its only connection to Nevada is its registered agent.

11.    Defendant DEVIANT ENTERTAINMENT, LLC (hereinafter "DEVIANT") is a California Limited Liability Company whose registered agent is Defendant APRIL D. CARTER (hereinafter "CARTER"), at 17939 Chatsworth Street #243, Granada Hills, California 91344.

12.    Defendant CARTER is the controlling Member of DEVIANT.

13.     Defendant GORGON LLC (hereinafter "GORGON") is a Delaware Limited Liability Company with a Delaware registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

14.     Defendant APRIL D. CARTER (hereinafter "CARTER") is the controlling Member of GORGON.

15.     Defendant MORE NEWS LATER MEDIA, LLC (hereinafter "MNL") is a Delaware Limited Liability Company with a Delaware registered agent, A Registered Agent Inc., at 8 The Green, Suite A, Dover, Delaware 19901.

16.     Defendant ROBERT E. LAURIE (hereinafter "LAURIE") is the controlling Member of MNL.

17.     Defendant NIKKI NUTRITION L.L.C (hereinafter "NNL") is a Florida Limited Liability Company who used EPP and OIM's business address for its SBA COVID-19 grants and loans and whose registered agent is Defendant NICOLE C. NOYA, at 1244 South Alhambra Circle, Coral Gables, Florida 33146.

18.     Defendant NOYA is the controlling member of NNL.

19.     Defendant ON IT MEDIA LLC (hereinafter "OIM") is a Delaware Limited Liability Company with principal office addresses located at 107 South West Street, Suite 136, Alexandria, Virginia 22314 and 45915 Maries Road, Unit 138, Sterling, Virginia 20166.

20.     Although Defendant OIM claims the business address of its Delaware registered agent, A Registered Agent Inc., at 8 The Green, Suite A, Dover, Delaware 19901, it conducts all its business and operations in Virginia, and has done so since its formation on October 19, 2020.

21.     OIM has no employees or officers located in Delaware, and its only connection to Delaware is its registered agent.

22.     Defendant PRESTIGE BUSINESS SOLUTIONS, LLC (hereinafter "PBS") is a Michigan Limited Liability Company whose registered agent is Defendant CARRIE A. GROENWOLD (aka CARRIE A. KENNEDY) (hereinafter "GROENWOLD"), at 4140 Buttrick Avenue Southeast, Ada, Michigan 49301.

23.     Defendant GROENWOLD is the controlling member of PBS.

24.     Upon information and belief, Defendant CARTER is a U.S. Citizen with a TWENTY-FIVE PERCENT (25%) Member-Manager ownership stake in EPP, a THIRTY-THREE AND 33/100 PERCENT (33.33%) ownership stake in OIM, and controlling interests in DEVIANT and GORGON, residing at 1201 South Barton Street, Unit 169, Arlington, Virginia 22204.

25.     CARTER is also an individual outside of the context of EPP, OIM, DEVIANT, and GORGON, involved in the facts of this case.

26.     Upon information and belief, Defendant KENNETH J. FIELDS (hereinafter "FIELDS") is a U.S. Citizen who has actively worked with members of EPP and OIM in furtherance of the enterprises' conspiracies and to conceal the ongoing wrongdoing of EPP, OIM, and its members, and who resides at 2027 Hillyer Place Northwest, Washington, District of Columbia 20009.

27.     FIELDS is not a member of EPP or OIM but owns a significant portion of the assets of OIM.

28.     FIELDS is also the spouse of Defendant NOYA.

29.     Upon information and belief, Defendant GROENWOLD is a U.S. Citizen and the controlling member of PBS that handled EPP's accounting, audits, derivative and regular

financial reporting, and tax returns, residing at 4140 Buttrick Avenue Southeast, Ada, Michigan 49301.

30.     GROENWOLD is believed to have assisted EPP with creating the financial reports submitted with EPP's United States Small Business Administration (hereinafter "SBA") COVID-19 Disaster Grants and Loans.

31.     GROENWOLD is an individual outside the context of PBS, involved in the facts of this case.

32.     Upon information and belief, Defendant JOAN G. JONES is a U.S. Citizen, owning a sole proprietorship named MEDIA MAKEUP 4 U, who was claimed as an employee on EPP's SBA Disaster Loans and Grants, though at all times allegedly being an independent contractor, and who resides at 2914 Gillis Falls Road, Mount Airy, Maryland 21771.

33.     Upon information and belief, Defendant LAURIE is a U.S. Citizen with a TWENTY-FIVE PERCENT (25%) Member-Manager ownership stake in EPP, THIRTY-THREE AND 33/100 PERCENT (33.33%) ownership stake in OIM, and a controlling interest in MNL, residing at 6008 Curtier Drive, Unit F, Alexandria, Virginia 22310.

34.     LAURIE is also an individual outside of the context of EPP, OIM, and MNL, involved in the facts of this case.

35.     Upon information and belief, Defendant JUAN CARLOS ALBARRÁN MÁRQUEZ (hereinafter "MÁRQUEZ") is a U.S. Green Card Holder who is a host of EPP's travel show, *The Jet Set (En Espanol),* residing at 6008 Curtier Drive, Unit F, Alexandria, Virginia 22310.

36.     MÁRQUEZ is also an individual outside the context of EPP and OIM.

37.     MÁRQUEZ is also the spouse of Defendant LAURIE.

38.     Upon information and belief, Defendant NOYA is a U.S. Citizen with a TWENTY-FIVE PERCENT (25%) Member-Manager ownership stake in EPP and THIRTY-THREE AND 33/100 PERCENT (33.33%) ownership stake in OIM, and controlling interest in NNL, residing at 2027 Hillyer Place Northwest, Washington, District of Columbia 20009.

39.     NOYA is also an individual outside of the context of EPP and OIM who is involved in the facts of this case.

40.     Defendant JAIME VALVERDE (hereinafter "VALVERDE") is an individual who received money from EPP, despite having no business relationship with the EPP.  He is believed to reside at 2240 North Beauregard Street, Apartment 1, Alexandria, Virginia 22311.

41.     VALVERDE's citizenship status is unknown.

## STATEMENT OF FACTS

### *Formation of EPP*

42.     On or about 2011, Plaintiff and LAURIE, fellow travel bloggers and friends, integrated their independent travel blogs into a partnership to launch a travel blog called "SavvyStews.com" (hereinafter "SSC" or "SS"), named after the trademark SAVVY STEWS, which Plaintiff and LAURIE co-created.[1]

43.     On or about 2013, SSC became a scripted web series syndicating to SavvyStews.com, BlipTV, DailyMotion, TiVO, and YouTube, and other syndicates with an average viewership of 40,000 per episode.

---

[1] This trademark is the subject of cancellation proceeding number 92,078,662 with the United States Patent and Trademark Office (hereinafter "USPTO")'s Trademark Trial and Appeal Board (hereinafter "TTAB").  Since this Court has jurisdiction to hear federal questions regarding federally registered trademarks, Plaintiff will seek leave below to consolidate the cancellation proceeding into this federal Complaint.  Defendant LAURIE applied for the trademark under Defendant MNL's moniker on May 11, 2020 *after* his fallout with Plaintiff, and while Defendants CARTER, FIELDS, LAURIE, and NOYA were plotting to illegally funnel EPP assets into OIM.

44.     As SSC gained popularity and acclaim, Plaintiff and LAURIE co-hosted several SS travel segments on a number of local television programs, including *Charlotte Today*, FOX 31 Denver, *Good Day Oregon*, *Good Day Orlando*, *Great Day Houston*, *Great Day Saint Louis*, *The Morning Blend*, NBC 3 WKYC, and NBC 6 *South Florida Today*.

45.     Plaintiff and LAURIE also produced and co-hosted SS segments for broadcast on the CNN Airport Network, a nationwide network which creates content for airports across the United States.

46.     Plaintiff and LAURIE enjoyed additional national television acclaim under the SS brand on *The Better Show*, *The Daily Buzz*, and the Discovery Channel.

47.     On or about October 15, 2015, Plaintiff, CARTER, LAURIE, and JESSICA REYES (hereinafter "REYES") formed EPP under the laws of the State of Nevada for the purposes of producing and recording a new travel show, *The Jet Set* (hereinafter "*TJS*"), named after the trademark THE JET SET, which Plaintiff, Defendants CARTER and LAURIE, and REYES co-created.[2]

48.     The Members of EPP executed an Operating Agreement entitling each Member to even distribution of EPP's net profit and losses, as well as a TWENTY-FIVE PERCENT (25%) voting stake each in all decisions impacting the profits and losses of EPP.

---

[2] This trademark is the subject of cancellation proceeding number 92,078,743 with the USPTO's TTAB.  Since this Court has jurisdiction to hear federal questions regarding federally registered trademarks, Plaintiff will seek leave below to consolidate the cancellation proceeding into this federal Complaint.  Defendant LAURIE applied for this trademark on behalf of EPP on May 27, 2020 under the title of "President" of EPP *after* Defendants CARTER, LAURIE, and NOYA's plot to wrongfully oust Plaintiff from EPP.  In furtherance of their conspiratorial activities to drain the assets of EPP, Defendants CARTER, LAURIE, and NOYA assigned the trademark to OIM, which they did not have clear and legal title to, under the auspices that OIM agreed to assume EPP's SBA COVID-19 debt (which EPP had no permission from the SBA to assign) as consideration for the assignment.

49.    The operating agreement is silent as to the expulsion of members and to revocation of equity in the company.

50.    LAURIE was selected by the members to serve in the function as Chief Financial Officer of EPP, though he was not given that title.

*EPP's Operations*

51.    EPP's primary operations are conducted in Virginia, where Defendants CARTER, LAURIE, MÀRQUEZ, and VALVERDE reside, and where GORGON, MNL, and NNL claimed the address for its SBA COVID-19 grants and loans, with principal places of business in Alexandria and Sterling.  Defendant NOYA lives in District of Columbia within a 30-mile radius of both of EPP's business locations.

52.    EPP produces and records the programs *TJS*, *The Tech Show* (hereinafter "*TTS*"), and *Take A Look* (hereinafter "*TAL*") at its Sterling, Virginia studio.

53.    On or about June 2016, after a few *TJS* recordings, REYES resigned her Membership with EPP, and was replaced by BRADFORD SMITH (hereinafter "SMITH").

54.    On or about January 2019, SMITH resigned his Membership position and was replaced by NOYA.

55.    SMITH currently serves as an independent contractor for EPP and OIM.

56.    SMITH is believed to be JOHN DOE 10.

57.    When LAURIE was placed in charge of the finances, no financial controls or oversight was placed on LAURIE or on the company's finances, in effect giving him complete control over the business' purse.

58.     LAURIE subsequently discovered how easy it is to conceal financial wrongdoing behind second-order financial reporting sheets, such as Profit and Loss statements and other such derivative financial accounting.

59.     On January 30, 2018, FIELDS, NOYA's husband, made two (2) unsecured loans to EPP in the form of a Promissory Note in the amount of $25,750.00, and in the form of a $40,000 Line of Credit.  Ex. A and B.

60.     EPP, by LAURIE, withdrew at least $10,000 of the Line of Credit on September 27, 2018.

61.     Upon information and belief, EPP, by LAURIE, withdrew an additional $20,000 at various other times from the Line of Credit.

62.     Beginning in or about 2018, each Member was initially paid a FIVE THOUSAND TWO HUNDRED FIFTY DOLLARS ($5,250.00) per month distribution on a bi-weekly basis.

63.     By the end of 2018, each Member's monthly distribution was reduced to THREE THOUSAND FIVE HUNDRED DOLLARS ($3,500.00) per month paid on a bi-weekly basis. This reduction occurred despite EPP continually bringing in new business.

64.     On or about January 27, 2020, Plaintiff noticed an irregular payment made from EPP's business account to an individual that he did not recognize, VALVERDE, in the amount of TWO THOUSAND DOLLARS ($2000.00), when he received a banking alert notification to his EPP email account.[3]  Ex. C, p. 7.

65.     When Plaintiff questioned LAURIE about the charge, LAURIE advised Plaintiff that VALVERDE was receiving LAURIE's bi-weekly paycheck of ONE THOUSAND SEVEN

---

[3] Plaintiff's EPP email account access was subsequently wrongfully revoked, as discussed *infra*.

HUNDRED FIFTY AND 00/100 DOLLARS ($1,750.00) and that LAURIE would refund the difference of TWO HUNDRED FIFTY DOLLARS ($250.00) the following business day.

66.    LAURIE did not refund the difference of $250.00 the following business day. *See* Ex. C, p. 7.

67.    LAURIE admitted that LAURIE did not consult the Members of EPP prior to making the distribution to VALVERDE.

68.    LAURIE also admitted that VALVERDE had no business relationship with EPP, and that the distribution was ostensibly made in order to help VALVERDE with a personal housing matter.

69.    LAURIE alleges that after notifying the Members of EPP of the distribution to VALVERDE after the fact, that they were okay with the distribution that was made to VALVERDE.

70.    This is not true.

71.    In fact, Plaintiff filed a police report with the Loudoun County Sheriff's Department on April 20, 2020, when the Plaintiff could not get clear information from LAURIE on who VALVERDE was.  Ex. D.

72.    Plaintiff became aware of other anomalous expenditures and activities, such as:

    a.    Cash withdrawals from an ATM at the MGM Grand Casino in order to gamble with EPP's funds (*see* Ex. C, p. 4 and E, p. 2);

    b.    Accounts opened at multiple non-traditional online banks by LAURIE without the authorization or assent of EPP Members (*see e.g.*, Ex. C, F, G, and H; Defendant LAURIE also asserted there was at least another account held at BlueVine Bank);

    c.    LAURIE's incurring debt without the prior authorization or assent of EPP Members (*see e.g.*, Ex. I, J, K, L, and M);

    d.    CARTER deposited her regular paycheck into the companies DEVIANT and GORGON, as well as to her own personal accounts, though DEVIANT and GORGON are not a Members of EPP. *See e.g.*, Ex. C and E.

    e.    LAURIE deposited his regular paycheck into the company MNL, as well as to his own personal accounts (*see e.g.*, *id.*); and that

    f.    LAURIE mysteriously declared MNL as 25% Member-Manager of EPP beginning in 2019 without the prior authorization or assent of any Members of EPP.[4,5]

73.    CARTER and NOYA were curiously uncurious about what actions LAURIE had taken as the effective Chief Financial Officer of EPP.

74.    DAVID, on the other hand, grew increasingly concerned with the manner in which LAURIE was managing the finances, and he began demanding, as is his right as a Member, to see all of EPP's financial data and especially the bank statements (hereinafter the "Withheld Statements"), which CARTER, LAURIE, and NOYA refused to provide to him.

75.    DAVID was also concerned that the company did not keep accurate records, did not keep meeting minutes, and did not have adequate controls or oversight on the other Members' activities.

76.    Defendants CARTER, LAURIE, NOYA, and OIM admit that no written minutes are kept for alleged voting decisions made by EPP's and OIM's Members.

---

[4] *See* Ex. N, O, P, and Q showing the change in Membership from LAURIE to MNL.
[5] This change was done with assistance of Defendants KENNEDY and PBS. *See e.g.*, Ex. R and S.

77.     Defendants CARTER, LAURIE, and NOYA continually refused to provide access to EPP's books and records, offering only to provide weekly "summary" reports of EPP's financial records; such refusals continued throughout March 2020.

78.     LAURIE created false or misleading derivative financial documents ("summary reports") with which to deceive DAVID and his fellow EPP members and conceal his own financial malfeasance from them.

*DAVID's Lock-Out*

79.     As LAURIE became increasingly concerned that DAVID would discover LAURIE's financial wrongdoing, LAURIE convinced CARTER and NOYA to agree to keep the Withheld Statements from DAVID.

80.     As such, CARTER and NOYA assented, with LAURIE, to conspire to breach their fiduciary duty to DAVID by denying him access to the Withheld Statements in violation of Virginia and Nevada law, in order to conceal LAURIE's and their own wrongdoings.

81.     CARTER, LAURIE, and NOYA further sought to address the threat that DAVID's inquisitiveness posed to their position by first attempting to "gas light" DAVID into thinking he was being unreasonable to ask for the Withheld Statements.

82.     CARTER, LAURIE, and NOYA subsequently attempted to gas light DAVID into thinking that the reason that they refused him access to the banking and financial records of EPP was Plaintiff's alleged personal financial difficulties and their collective fear, without basis or merit, that he would embezzle money from EPP.

83.     When CARTER, LAURIE, and NOYA were unable to gas light DAVID, they continued to withhold the books while implementing measures to provoke DAVID into leaving EPP, which did not work.

84.     For several months after observing a pattern of financial misconduct, Plaintiff continued to demand access to EPP's books and records, which CARTER, LAURIE, and NOYA refused to provide, offering only weekly "summary" reports authored by LAURIE relating to EPP's finances.

85.     The summary reports were not provided weekly, but were irregular, sporadic, and often covered a period of a month or less.

86.     Virginia Code § 13.1-1028 grants all members of a limited liability company the right to inspect and review all business and financial records.

87.     Nevada Revised Statutes (hereinafter "NRS") § 86.241 provides the same rights for members to inspect and review company records.

88.     On multiple occasions, Plaintiff told his fellow EPP Members that he considered refusing to allow him to view the banking and financial records as a constructive wrongful disassociation and a violation of the fiduciary duty owed to him by EPP, CARTER, LAURIE, and NOYA.

89.     Plaintiff on multiple occasions indicated that he viewed his treatment by EPP, CARTER, LAURIE, and NOYA as a "lock-out" from the company.

90.     On or about March 7, 2020, when Plaintiff finally reached the end of his patience with CARTER, LAURIE, and NOYA's wrongful refusal to provide Plaintiff with access to EPP's banking and financial records, he refused to complete a *TJS* taping in California.

91.     CARTER and NOYA allege that Plaintiff told them that he "quit."

92.     LAURIE admits that he never spoke with Plaintiff about whether he quit, but that after "confirming" with CARTER and NOYA that Plaintiff had done so, that LAURIE determined that it was true.

93.     DAVID never resigned his position at EPP nor made any indication that he intended to forfeit his 25% interest in EPP.

94.     Rather than attempt to negotiate with DAVID or work on a good-faith basis to resolve DAVID's concerns, CARTER, LAURIE, and NOYA chose to take the opportunity the opportunity to oust DAVID from EPP under the auspices that he "quit."

95.     Consequently, on or about March 7, 2020, CARTER, LAURIE, and NOYA allegedly voted to terminate Plaintiff's EPP membership and lock Plaintiff out of all EPP accounts, as well as all accounts related to EPP, and began publishing and communicating false information that Plaintiff resigned from EPP.

96.     Even though the Operating Agreement indicates that Plaintiff has a 25% voting stake in all decisions, Plaintiff's vote was not solicited, and Plaintiff was not given notice of or allowed to participate in the alleged vote, as was his right.

97.     Va. Code § 13.1-1040.1 defines the events that can cause a member of a limited liability company to be dissociated.  Plaintiff did not become dissociated under any of these defining events.

98.     Even though Plaintiff never resigned from EPP, Va. Code § 13.1-1040.2 provides that even a dissociated member is entitled to said member's membership interest in the business. In Plaintiff's case, such membership interest is 25%

99.     The Nevada Revised Statutes do not provide information on dissociating a member in the absence of a definition in the operating agreement, but the Statutes are clear that such members are associated to the fair market value of their membership interest.  *See* NRS §§ 86.331 and 86.335.

100.    NRS § 86.491(4)(a) states, in part, that the "resignation, expulsion, bankruptcy, dissolution or disassociation of a member or any other event affecting a member, including, without limitation, a sole member, does not: (a) terminate the status of the person as a member . . . ."

101.    CARTER, LAURIE, and NOYA, did not compensate, or offer to compensate, DAVID for his Membership interest in EPP; such interest estimated to be valued at approximately $500,000.

102.    CARTER, LAURIE, and NOYA also did not return DAVID's business and personal property; including two (2) twin-sets of vintage Boeing 747 first-class seats, as well as the set that OIM currently uses to tape *TJS* episodes.

103.    Despite CARTER, LAURIE, and NOYA's unfriendly actions, DAVID attempted to negotiate for the sale of his equitable interest in EPP.

104.    Either unwilling or unable to pay DAVID for his equitable interest in EPP, CARTER, LAURIE, and NOYA elected instead to try to convert it by dissolution.

105.    Additionally, CARTER, LAURIE, and NOYA took actions to usurp Plaintiff's intellectual property interests in trademarks that he created and/or co-created.

106.    First, LAURIE under the banner of MNL, filed a trademark for SAVVY STEWS on May 11, 2020, notably claiming a use-in-commerce date nearly nine (9) years prior to the application date.  Ex. T.

107.    Adding insult to injury, LAURIE and MNL used Plaintiff's likeness in the trademark specimen, without Plaintiff's permission, in the process of working to steal Plaintiff's intellectual property.  *Id.*

108.    The USPTO issued trademark registration number 6,359,536 (hereinafter "the '536 trademark") to MNL for SAVVY STEWS on May 25, 2021.

109.    Plaintiff instituted cancellation proceeding 92,078,662 with the USPTO's TTAB on December 16, 2021 on the grounds that: (1) registrant is not the rightful owner of mark for identified goods or services pursuant to Trademark Act Sections 14(1) and 1; (2) there is a false suggestion of a connection with persons, living or dead, institutions, beliefs, or national symbols, or to bring them into contempt, or disrepute pursuant to Trademark Act Sections 14(3) and 2(a); (3) the registration is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used pursuant to Trademark Act Section 14(3); (4) the registration consists of or comprises a name, portrait, or signature of a deceased president without the written consent of the surviving spouse pursuant to Trademark Act Sections 14(1) and 2(c); and (5) fraud on the USPTO pursuant to Trademark Act Section 14(3); *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009).  Ex. U.

110.    Similarly, LAURIE, as "President" of EPP, filed a trademark application for THE JET SET on May 27, 2020, notably claiming a use-in-commerce date nearly (6) years prior to the application date.  Ex. V.

111.    The USPTO issued trademark registration number 6,232,163 (hereinafter "the '163 trademark") to EPP for THE JET SET on December 29, 2020.

112.    According to Defendants CARTER, LAURIE, NOYA, and OIM, EPP, with LAURIE's signature, and CARTER and NOYA's assent, assigned the disputed trademark to

OIM in consideration for non-assignable SBA COVID-19 EIDL debt[6,7] on January 23, 2021.
*See* Ex. W.

113.    Interestingly, the Trademark Assignment Cover Sheet filed with the USPTO
states that the reason for the assignment was due to a "name change," and not an assignment or
conveyance. *Id.*

114.    Defendants CARTER, LAURIE, NOYA, and OIM have consistently held that
EPP no longer does business as of October 19, 2020, despite EPP's debt obligations to the SBA.[8]

115.    Defendants CARTER, LAURIE, and NOYA have also consistently held that EPP
and OIM and are two separate entities and have allegedly even closed all of EPP's bank
accounts.

116.    Plaintiff is unaware of any name change documents filed with any secretaries of
state changing the name of EPP to OIM.

117.    Additionally, CARTER, LAURIE, and NOYA, in violation of EPP's obligation to
SBA COVID-19 debt,[9] have intentionally allowed EPP's good standing to lapse with the Nevada
Secretary of State.  Ex. X.

118.    Plaintiff instituted cancellation proceeding 92,078,743 on December 24, 2021
with the USPTO's TTAB on the grounds that: (1) registrant is not the rightful owner of mark for
identified goods or services pursuant to Trademark Act Sections 14(1) and 1; (2) the registration
is deceptive pursuant to Trademark Act Sections 14(3) and 29(a); (3) the registration is being
used by, or with the permission of, the registrant so as to misrepresent the source of the goods or

---

[6] The SBA loans are discussed *infra* in detail.
[7] *See* Ex. EE (containing SBA Form 1391 which is issued with all SBA Economic Injury Disaster Loans (hereinafter "EIDL"), and which prohibits borrowers from assigning any SBA debts without prior approval from the SBA).
[8] *See id.* (requiring borrowers to maintain good standing during the duration of the EIDL loan term).
[9] *Id.*

services on or in connection with which the mark is used pursuant to Trademark Act Section 14(3); and (4) fraud on the USPTO pursuant to Trademark Act Section 14(3); *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009).  Ex. Y.

*Florida Lawsuit*

119.    To defend against the allegation that he voluntarily quit his position at EPP, DAVID publicly pressed his claims against EPP and CARTER, LAURIE, and NOYA, and in so doing, put pressure on them to answer his claims.

120.    CARTER, LAURIE, and NOYA have alleged that several of EPP's customers and individuals expressed concern about DAVID's accusations, and that, as a result, it became increasingly difficult to do business as EPP.

121.    CARTER, LAURIE, and NOYA have not provided a comprehensive list of who these alleged customers and individuals are.

122.    Notably, NOYA refuses to provide a list of individuals that Plaintiff purportedly contacted for fear that it would "embarrass" her.

123.    In fact, the nature of the circumstances surrounding DAVID's lock-out from EPP, and the character of the individuals involved, prompted SARA NELSON (hereinafter "NELSON"), the President of the Association of Flight Attendants (hereinafter "AFA"), and AFA's most valuable relationship, whom DAVID engaged as an EPP client, to choose to no longer do business with EPP.

124.    Specifically, CARTER, LAURIE, and NOYA falsely advised NELSON that the Plaintiff left his position at EPP.

125.    The termination of the AFA's relationship with EPP also took place during peak moments of the COVID-19 pandemic when AFA was having to evaluate accounts for financial cutbacks.

126.    When CARTER, LAURIE, and NOYA could not get AFA or NELSON on board with their schemes against Plaintiff, they, along with MÁRQUEZ, took to publicly defaming AFA and NELSON.  *See e.g.,* Ex. CC and HH.

127.    CARTER, LAURIE, and NOYA have admitted that the AFA's business made up a quarter to a third of EPP's annual revenue.

128.    In response, Defendants EPP, CARTER, LAURIE, and NOYA filed a lawsuit against Plaintiff in the 11th Judicial Circuit Court in and for Miami-Dade County, Florida on August 7, 2020 for tortious interference with business relationships, intentional infliction of emotional distress, and, ironically, defamation.

129.    DAVID's insurer provided counsel under DAVID's insurance policy to defend DAVID against these claims, with a scope limited to DAVID's defense only.

130.    During initial evidentiary hearings, and before the completion of discovery, it was shown through depositions and financial statements that:

   a.   $37,000 in EPP revenue was not accounted for or reconcilable;

   b.   LAURIE made the afore-referenced transfers to MNL from the EPP and/or OIM accounts;

   c.   An inexplicable bank withdrawal in the amount of $5,800 was made from the EPP and/or OIM accounts;

   d.   Non-business-related ATM withdrawals were made at an MGM casino; and,

   e.   The $2,000 payment mentioned *supra* to VALVERDE was made.

*See* Ex. Z.

131.    After objecting to subpoenas directed to EPP's corporate bank accounts[10],
Defendants EPP, CARTER, LAURIE, and NOYA filed a Notice of Voluntary Dismissal of the
Miami-Dade suit on April 20, 2021.  *Id.*

132.    Plaintiff's insurer then successfully recovered its attorneys' fees and costs from
Defendants following the dismissal of the suit on July 13, 2021.  *Id.*

*Defendants Defame David*

133.    After having to withdraw their lawsuit, Defendants EPP, CARTER, LAURIE, and
NOYA created and began publishing false and defamatory information about Plaintiff on EPP's
website and on a website owned by EPP, "Gailen David Facts" (hereinafter "GDF") found at:
https://www.gailendavidfacts.com.  *See e.g.*, Ex. AA.

134.    This defamation was carried out with the assistance of JOHN DOES 1 and 2 of
this suit, believed to be RICHARD I. NACHT and NACHT & ASSOCIATES PC, who
Defendants EPP, CARTER, LAURIE, and NOYA allege is an attorney and/or law firm that
assisted them with drafting the published defamatory information.

135.    The GDF website is still online today.  *See e.g.*, Ex. AA.

136.    The GDF website falsely asserts, among other things, that:

    a.  Plaintiff had perjured himself in the Florida lawsuit (*see e.g.*, Ex. BB);

    b.  Plaintiff is a sociopath who makes up stories to trick people into giving
        him things (*see e.g.*, Ex. CC);

    c.  Plaintiff is untrustworthy with money (*see e.g.*, Ex. BB);

---

[10] The objections were especially related to the SBA COVID-19 Disaster Relief loans.  *See* Ex. Z.

    d.   Plaintiff is a grifter who exploits his audience for mere financial gain (*see e.g.*, Ex. BB and CC);

    e.   Plaintiff feloniously filed a false police report (*see e.g.*, Ex. BB);

    f.   Plaintiff is a compulsive liar (*see generally*, GDF website).

137.    Defendants EPP, CARTER, LAURIE, and NOYA further defamed Plaintiff by impersonating Plaintiff and publishing false and defamatory information on Plaintiff's social media accounts and pages, which said Defendants hijacked using stolen login credentials from Plaintiff's EPP account.  In particular, Defendants, posting as Plaintiff:

    a.   Posted several portions of a privileged medical questionnaire which DAVID had sent to his psychotherapist in preparation for treatment (*see e.g.*, Ex. DD, FF, and GG);

    b.   Mocked Plaintiff's mental health issues (*see e.g.*, Ex. GG);

    c.   Posted that Plaintiff had insurance so that he could lie about Defendants (*see e.g.*, Ex. CC);

    d.   Posted that he lied about Defendants' stealing in order to get a pay-off for himself (*see e.g.*, Ex. AA).

138.    Defendants EPP, CARTER, LAURIE, and NOYA also posted links to GDF on their personal and corporate social media pages and other public forums.

139.    Defendants EPP, CARTER, LAURIE, and NOYA have never taken down their defamatory social media posts against Plaintiff.

140.    Defendant MÀRQUEZ also participated in EPP, CARTER, LAURIE, and NOYA's defamation by posting links to GDF on his Facebook, Instagram, and other forums and social media pages in order to solicit "public opinion."  *See e.g.*, Ex. HH.

141.    MÀRQUEZ has never taken down his defamatory posts against Plaintiff.

142.    On or about March 21, 2020, the Plaintiff and his business and life partner, STEPHEN C. LICATA, formed AIROPLEX, a Florida Limited Liability Company offering advice and information about the travel industry.

143.    The Plaintiff and LICATA use AIROPLEX to offer goods and services relating to the travel industry, as well as not-for-profit entities, such as JETIQUETTE and AIR HISTORY PROJECT INC. (hereinafter "AIR HISTORY") to promote travel etiquette and retention of the history of the air travel industry.

144.    As Plaintiff is the face of much of AIROPLEX's activities and Internet presence, the defamation he continues to suffer harms his and AIROPLEX's business interests, as well as their affiliations and subsidiaries.

145.    Currently, Plaintiff is also employed full-time as a contractor for the AFA as a labor advocate and his responsibilities require him to unify and lead flight attendants to help them form a labor union.

146.    Plaintiff requires the trust and goodwill of flight attendants in order to fulfill his responsibilities to the AFA.

147.    As a result of the Defendants' defamation, Plaintiff has had several contacts he cultivated in his attempts to unionize flight attendants break off contact with the Plaintiff, significantly hampering his ability to accomplish the tasks assigned to him by AFA, as well as threatening his employment with the AFA, and therefore, his business and financial interests.

*LAURIE Converts* THE ALUMINUM LADY *YouTube Channel*

148.    The Plaintiff maintained a YouTube channel, *The Aluminum Lady* (hereinafter "*AL*"), that which began on August 12, 2007, and to which he had posted more than 40 videos with a collective 500,000 views.

149.    The Plaintiff has used this forum to promote his advocacy for flight attendants, their needed work protections, and related issues.

150.    Sometime after Plaintiff's lock-out from EPP, LAURIE accessed and deleted all *AL* content on the Plaintiff's *AL* YouTube account.  *See* Ex. VV.

151.    LAURIE admitted to destroying all of the *AL* content to spite and harm the Plaintiff.

152.    The *AL* loss was grave, because even if the Plaintiff were to recreate the content to the best of his ability, he would be unable to reproduce the number of views each video received, thereby doing irreversible damage to Plaintiff's former and future advocacy efforts and goodwill.

153.    LAURIE knew this and intentionally did this to punish the Plaintiff and undermine his advocacy efforts.

154.    All defamatory Internet postings on the part of Defendants CARTER, LAURIE, MÁRQUEZ, and NOYA, while using EPP as a vehicle, are posted maliciously with the intent to harm the Plaintiff and his businesses.

155.    Further, Defendants CARTER, LAURIE, MÁRQUEZ, and NOYA's efforts to embarrass, defame, and libel the Plaintiff seek not only to reduce the cache of the Plaintiff's personal and business interests and reputations, but to tarnish and destroy the same.

*CARTER, LAURIE, and NOYA Implicate DAVID and EPP with Fraudulent SBA COVID-19*

*Disaster Grant and Loan Applications*

156.     Without the AFA's business and the negative publicity from DAVID having to publicly defend his reputation and interests in the face of their slanderous and libelous actions, Defendants CARTER, LAURIE, and NOYA admitted EPP was in serious danger of failing.

157.     The COVID-19 Pandemic gave CARTER, LAURIE, and NOYA the opportunity they needed to get money quickly to continue to conceal their financial wrongdoings in the form of government assistance.

158.     Plaintiff has discovered that Defendant EPP, by CARTER, LAURIE, and NOYA, has taken out three (3) COVID-19 Disaster Loans from the United States Small Business Administration (hereinafter "SBA") with a value of over $295,000; (one Paycheck Protection Program (hereinafter "PPP" ) Loan issued on April 3, 2020 for $44,375, one PPP loan issued on January 23, 2021 for $51,165, and one Economic Injury Disaster Loan (hereinafter "EIDL") issued on May 28, 2020 for $150,000, which was subsequently modified on July 12, 2021 to include an additional $50,000).  Ex. I, J, K, L, and M.

159.     Additionally, Defendant EPP, by CARTER, LAURIE, and NOYA claimed at least $8,000 in free SBA EIDL grant money.  Ex. II.

160.     This means that Defendant EPP, by CARTER, LAURIE, and NOYA claimed at least eight (8) employees.[11]

161.     Plaintiff's approval was never sought to apply for these disaster loans or grants.

---

[11] SBA guidelines at the time of EPP's application issued EIDL grants on the basis of headcount.  Specifically, eligible businesses were entitled to receive $1,000 per employee up to $10,000.  See Ex. JJ, ¶ 6 regarding original EIDL advances (U.S. SMALL BUSINESS ADMINISTRATION, FREQUENTLY ASKED QUESTIONS, COVID-19 ECONOMIC INJURY DISASTER LOAN (EIDL), updated Apr. 27, 2021, available at: https://www.sba.gov/sites/default/files/2021-04/COVID-19%20EIDL%20FAQs_FINAL-508.pdf).

162.    In its application for these loans and grants, Defendant EPP, by CARTER, LAURIE, and NOYA, knowingly made materially false statements regarding the number of employees at EPP in order to increase the amount of public money that CARTER, LAURIE, and NOYA would receive, through EPP, from the SBA in PPP loans.

163.    Specifically, CARTER, LAURIE, and NOYA allege that EPP has no employees and only employs independent contractors.

164.    CARTER, LAURIE, and NOYA allege that EPP does not issue W-2s for any of its "employees" and only 1099s.

165.    This means that Defendant EPP was not authorized to claim PPP money even under the earliest of the SBA's PPP guidelines.  *See* Ex. KK and LL.[12]

166.    It was widely known at all times that independent contractors could not be claimed on PPP applications.  *See e.g.*, Ex. MM.[13]

167.    Even if CARTER, LAURIE, and NOYA tried to feign ignorance of the law and rules on the first PPP draw, which they had full knowledge of, they definitely could not feign it on the second draw in 2021.

168.    Additionally, said "employees" claimed by Defendant EPP, through CARTER, LAURIE, and NOYA, upon information and belief, applied for and received separate PPP loans. These "employees" are CARTER, DEVIANT, GORGON, JONES, LAURIE, MNL, NNL,

---

[12] Ex. KK and LL contain the first (Version 1) and last (Version 10) iterations of the SBA's PAYCHECK PROTECTION PROGRAM LOANS FREQUENTLY ASKED QUESTIONS (FAQs), published on June 25, 2020 and July 29, 2021 and available at https://www.sba.gov/sites/default/files/2020-06/Paycheck-Protection-Program-Frequently-Asked-Questions%20062520-508.pdf and https://www.sba.gov/sites/default/files/2021-07/FINAL%20FAQ%20Update%207.29.21-508.pdf.  As can be seen in both versions, paragraph 15, which addresses claiming independent contractors, has never changed.

[13] Ex. MM contains the PAYCHECK PROTECTION (PPP) INFORMATION SHEET: BORROWERS, published by the U.S. Department of the Treasury prior to April 2020 and laying out the guidelines for when small businesses, sole proprietorships, independent contractors, and self-employed individuals could apply for PPP loans, available at https://home.treasury.gov/system/files/136/PPP--Fact-Sheet.pdf.

NOYA, MÀRQUEZ and JOHN DOES 3 through 15 of this suit, believed to be SONYA

GAVANKAR (aka SONYA McKAY) (hereinafter "GAVANKAR"), MEDIA MAKEUP 4 U

(hereinafter "MM4U"), PAX & PEACE COMMUNICATIONS, LLC (hereinafter "PAX"),

SHAWN PORTMANN (hereinafter "PORTMANN"), KENNETH TORSIENDE (hereinafter

"TORSIENDE"), MOHAMMAD SADDIQ (hereinafter SADDIQ), MMI, INC. (hereinafter

"MMI"), SMITH, and/or affiliated entities or subsidiaries of the suspected DOES.

169.     As of the filing of this suit, both of EPP's PPP loans have been forgiven, allowing

them to wrongfully and illegally receive public money to which it was not entitled.  Ex. NN.

170.     JONES received at least one (1) PPP loan in the amount of $20,833 that was

forgiven.  Ex. QQ.

171.     LAURIE received at least one (1) PPP loan in the amount of $8,750 that was

forgiven.  Ex. PP.

172.     MNL received at least one (1) PPP loan in the amount of $4157 that was forgiven.

Ex. OO.[14]

173.     NNL, claiming EPP's address on its PPP loan application, received at least one

(1) PPP loan in the amount of $20,833 that was forgiven.  Ex. RR.

174.     Upon information and belief, JOHN DOES 3 through 15's PPP loans were

forgiven.[15]

---

[14] Notably, MNL used one of EPP's business addresses in the application of its PPP loan, despite being a Delaware Limited Liability Company.  Ex. GGG.

[15] Plaintiff is submitting FOIA requests to the SBA requesting information on the suspected JOHN DOES 3 through 15 to ascertain what public monies these individuals and entities received and the status of those funds, as the information is not readily publicly available and the DOES may have drawn the funds under different names and/or not yet identified entities.  The Plaintiff will also send a courtesy copy of his Complaint to the SBA Inspector General's and United States Attorney's Offices to make the entities aware of, and hopefully facilitate the investigation of, these suspect disbursed public monies.

175.    Upon information and belief, CARTER, DEVIANT, GORGON, JONES, LAURIE, MNL, NNL, NOYA, MÁRQUEZ, and JOHN DOES 3 through 15 also applied for and received free EIDL grant money for services provided to EPP.[16]

176.    Upon information and belief, GORGON received at least $1,000 in free COVID-19 EIDL grant money and used one of EPP's business addresses to collect the free money, despite being a Delaware Limited Liability Company.  Ex. BBB.

177.    Upon information and belief, GORGON also received a $40,700.00 COVID-19 EIDL loan, using EPP's business address for facilitating the loan.  Ex. CCC.

178.    Upon information and belief, LAURIE received two (2) COVID-19 EIDL loans in the amounts of $15,300.00 and $7,200.00, respectively.  Ex. DDD and EEE.

179.    Upon information and belief, MNL received at least $1,000 in free COVID-19 EIDL grant money.  Ex. FFF.

180.    Upon information and belief, Defendants GROENWOLD and PBS assisted in the preparation of the financial statements submitted to support EPP's SBA COVID-19 grant and loan applications.

181.    All public money deposits were made by the SBA and SBA lending institutions via wire transfers to Defendant EPP's accounts.

182.    Subsequently, the monies from these government loans and grants were immediately removed from EPP's main operating account at AZLO Bank, bit by bit, by and under the name of Defendant LAURIE. Ex. II.

183.    Defendants CARTER, LAURIE, and NOYA also made a wire transfer to FIELDS on June 16, 2020 in the amount of $41,812.50 from one of the many bank accounts opened by

---

[16] *Id.*

LAURIE on behalf of EPP, as an alleged loan repayment using the illegally-obtained SBA money. Ex. SS.

184.    The monies' current location and records accounting for its use are unknown.

185.    Plaintiff did not participate in the preparation of nor provide assent to any applications for public money form the government.

186.    Notably, the funds disbursed for EPP's second PPP draw and EIDL increase took place in 2021 after October 2020, the month and year CARTER, LAURIE, and NOYA alleged that EPP ceased doing business as in favor of OIM. *See discussion infra*; *see also* Ex. W (showing an intellectual property conveyance from EPP to OIM under the auspices of a name change).

*OIM's Creation and Relevant Activities*

187.    Despite the influx of capital, EPP was allegedly having difficulty doing business because DAVID, to defend against the slanderous and libelous allegations made against him by CARTER, LAURIE, NOYA, and MÁRQUEZ, both individually and using EPP as vehicle, had been releasing true information he had previously kept secret which reflected poorly on CARTER, LAURIE, and NOYA.

188.    It is around this time that FIELDS, NOYA's husband, involved himself more closely in CARTER, LAURIE, and NOYA's conspiracy because personal information regarding NOYA directly impacted him.

189.    FIELDS was motivated to help CARTER, LAURIE, and NOYA escape accountability for their financial malfeasance in order to frustrate DAVID in his attempts at recovery from EPP because DAVID had revealed the information regarding NOYA.

190.    In fact, upon information and belief, FIELDS financed the frivolous Florida lawsuit brought by Defendants EPP, CARTER, LAURIE, and NOYA.

191.    CARTER, FIELDS, LAURIE, and NOYA agreed that they would start a new company, OIM, in which they could continue their criminal enterprise absent the taint of DAVID's claims of their malfeasance.

192.    CARTER, FIELDS, LAURIE, and NOYA began plotting the funneling of EPP's assets to OIM, at least as early as April 2, 2020, during the filing of the frivolous Florida lawsuit, by evidence of a purchase agreement executed between EPP and FIELDS.  *See* Ex. TT.

193.    In this agreement, CARTER, LAURIE, and NOYA purported to sell all of EPP's assets at a non-market value price for $8298.01 as a loan repayment, at which when added to the $41,812.50 June 16, 2020 wire transfer to FIELDS using illegally-obtained SBA funds, previously mentioned, totals roughly $50,000.00 (just below the $55,000.00 that EPP supposedly borrowed from FIELDS).  *See id.* and Ex. SS.

194.    The $41,812.50 wire transfer from EPP to FIELDS' account took place roughly two-and a-half months after the execution of the Purchase Agreement, indicating several months of premeditation and plotting.  *See id.*

195.    On October 19, 2020, Defendants EPP, CARTER, LAURIE, and NOYA, with the advice and material support of FIELDS, started the company OIM.

196.    CARTER, FIELDS, LAURIE, and NOYA agreed to resume all of EPP's prior operations under the new banner of OIM.

197.    CARTER, FIELDS, LAURIE, and NOYA agreed to use OIM as a front for EPP's operations.

198.    As indicated *supra*, CARTER, FIELDS, LAURIE, and NOYA did not inform the SBA of these developments effecting EPP's SBA COVID-19 grants and loans.

199.    Later on November 1, 2020, in furtherance of their scheme, FIELDS leased EPP's equipment back to CARTER, LAURIE, and NOYA, using OIM as a vessel, for a nominal monthly lease payment of TEN DOLLARS ($10.00) (or ONE HUNDRED TWENTY DOLLARS ($120.00) per year).  *See* Ex. UU.

200.    Defendants CARTER, LAURIE, and NOYA admit that they started OIM in order to transfer EPP's customers, goodwill, intellectual property, former and ongoing operations, and other material and financial assets from EPP to OIM.

201.    Defendants EPP, CARTER, LAURIE, NOYA, and OIM also admit that JOHN DOES 3 through 15's contracted services were transferred from EPP to OIM.

202.    Defendants CARTER, LAURIE, NOYA, and OIM funneled all shows previously developed and produced by EPP, including *TJS*, *TTS*, and *TAL*, into this OIM to deprive Plaintiff of his ownership equity and intellectual property rights, while still collecting funds and paying expenses through EPP accounts.

203.    Defendants CARTER, LAURIE, and NOYA admit that EPP still owes an outstanding COVID-19 EIDL loan to SBA.

204.    Defendants CARTER, LAURIE, NOYA, and OIM allege that the only asset that OIM owns that belonged to EPP is the '163 trademark, in contradiction to their assertions that they have transferred EPP's customers, goodwill, former and ongoing operations, other intellectual property, and other material and financial assets from EPP.

205.    Surprisingly, Defendants CARTER, LAURIE, and NOYA cannot account for any of EPP's assets, with the exception of the GDL page, which CARTER, LAURIE, and NOYA openly admit that EPP owns.

206.    Defendants CARTER, LAURIE, NOYA, and OIM claim that as consideration for the '163 trademark, which they did not have clear and proper title convey, that OIM, by approval of EPP Members CARTER, LAURIE, and NOYA, agreed to assume EPP's non-conveyable SBA COVID-19 EIDL loan debt.

207.    There is no sales agreement, receipt, or SBA approval document to evidence OIM's guarantee of EPP's SBA COVID-19 EIDL loans.

208.    As previously mentioned, EPP, with LAURIE's signature, and CARTER and NOYA's assent, filed a "name change" as the reason for the ownership change with the USPTO. *See* Ex. W.

209.    Defendants EPP, CARTER, LAURIE, and NOYA admit that they did not ask the SBA for permission to transfer the debt, as is required under its EIDL Loan Authorization and Agreement, and that the SBA has not provided permission to transfer the debt.

210.    Despite transferring all assets from EPP to OIM, Defendants have maintained EPP, EPP's websites and social media presence, and EPP's online stores.

211.    Disturbingly, items purchased from EPP's online *TJS* Facebook shop, which sells MNL and NNL products, are actually linked to an MNL account.  *See* Ex. WW, XX, YY, and ZZ.[17]

---

[17] Notably, CARTER, LAURIE, and NOYA voided this transaction once their malfeasance was pointed out to them. *See* Ex. AAA.

*The Defendants DEVIANT, EPP (By Taint of CARTER, LAURIE, and NOYA), GORGON, MNL,*

*NNL, OIM, CARTER, FIELDS, LAURIE, and NOYA are Racketeers*

212.    CARTER, LAURIE, and NOYA do not treat DEVIANT, EPP, GORGON, MNL, NNL, and OIM as companies in their own right, but rather as *alter egos* which exist merely to shield their underlying illegal activities from view.

213.    This is especially true where EPP is concerned.

214.    DEVIANT, EPP (by taint of Members CARTER, LAURIE, and NOYA), GORGON, MNL, NNL, OIM, CARTER, FIELDS, LAURIE, and NOYA have demonstrated a pattern of cooperation in illegal activity and willingness to go to great lengths to prevent that illegality being discovered.

215.    The simple, undeniable fact is that when DAVID, a Member with equity in EPP, demanded to see the Withheld Statements, as is his right by law, he was flatly and unequivocally denied by CARTER, LAURIE, and NOYA.

216.    Had CARTER, LAURIE, and NOYA allowed DAVID to review the Withheld Statements to ensure that everything was in order, DAVID would not likely have been tipped off that something was awry.

217.    EPP, MNL, OIM, CARTER, FIELDS, LAURIE, and NOYA, took extraordinary steps to discredit DAVID first, to deny him what he was owed for his equitable share of EPP, to prevent CARTER, LAURIE, and NOYA's financial malfeasance to continue to go undetected, as well as attempt to avoid or counter any public shame and ridicule that might become public.

218.    In taking these steps, these Defendants, in essence, transformed EPP into a front for DEVIANT, GORGON, MNL, NNL, OIM, CARTER, FIELDS, LAURIE, and NOYA's

racketeering activities; which include using EPP to defraud the United States Government and American public of thousands of dollars of public money.

**COUNT I:**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**(hereinafter "RICO") ACT – 18 U.S.C. § 1962(c)**
(As to All Defendants)

219.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 218 as if fully set forth within.

220.    EPP is an enterprise engaged in and whose activities affect interstate commerce.

221.    Specifically, EPP is in the business of selling television and other content and other goods and services to nationwide networks and markets.

222.    All Count I Defendants are employed by and/or otherwise associated with the EPP enterprise.

223.    OIM is an enterprise engaged in and whose activities affect interstate commerce.

224.    Specifically, OIM is in the business of selling television and other content and goods and services to nationwide networks and markets.

225.    All Count I Defendants are employed by and/or otherwise associated with the OIM enterprise.

226.    DEVIANT is an enterprise engaged in and whose activities affect interstate commerce.

227.    Specifically, DEVIANT is in the business of cinematography, videotaping, and providing and selling other goods and services related to the pornography industry to nationwide networks and markets.

228.    All Count I Defendants are employed by and/or otherwise associated with the DEVIANT enterprise.

229.    GORGON is an enterprise engaged in and whose activities affect interstate commerce.

230.    Specifically, GORGON is in the business of providing court reporting and other goods and services to nationwide networks and markets.

231.    All Count I Defendants are employed by and/or otherwise associated with the GORGON enterprise.

232.    MNL is an enterprise engaged in and whose activities affect interstate commerce.

233.    Specifically, MNL is in the business of selling television and other content and goods and services to nationwide networks and markets.

234.    All Count I Defendants are employed by and/or otherwise associated with the MNL enterprise.

235.    NNL is an enterprise engaged in and whose activities affect interstate commerce.

236.    Specifically, NNL is in the business of providing fitness, health, and wellness advice, services, and products to nationwide networks and markets.

237.    All Count I Defendant are employed by and/or otherwise associated with the NNL enterprise.

238.    PBS is an enterprise engaged in and whose activities affect interstate commerce.

239.    Specifically, PBS in the business of providing auditing, accounting, financial, and tax preparation services and advise to nationwide networks and markets.

240.    All Count I Defendants are employed by and/or otherwise associated with the PBS enterprise.

241.    The Count I Defendants agreed to, conducted, and participated in the conduct of the EPP enterprise's affairs through a pattern of racketeering activity and for the unlawful

purpose of concealing financial information and intentionally defrauding Plaintiff of his ownership stake in EPP, his business, personal, and intellectual property, and to undermine his business relationships.

242.    The Count I Defendants did not want Plaintiff to discover their illegal and fraudulent use of EPP to embezzle money and obtain unauthorized public money, specifically by:

    a.  Refusing to allow Plaintiff opportunity to review financial and banking statements;

    b.  Misrepresenting or misleading Plaintiff as to the financial transactions, liabilities, payments, and other such information so as to have him lower his guard;

    c.  Misrepresenting Plaintiff's agreement or assent to incurring liabilities;

    d.  Diverting money from company accounts or moving money through different company accounts in order to prevent accurate accounting or detection;

    e.  Using EPP as a front and a pass-through entity to conceal the coordination among the Count I Defendants; and,

    f.  Using EPP as a front entity for fraudulent transactions.

243.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed related acts of:

    a.  Violation of 18 U.S.C. § 1343 by transferring company assets to third-parties (including FIELDS and VALVERDE ) without authorization;

    b.  Violation of 18 U.S.C. by knowingly submitting materially false statements to the SBA to obtain federal funding in connection with the presidentially-declared COVID-19 disaster;

c.  Violation of 18 U.S.C. § 1343 by intentionally entering into fraudulent loan agreements on behalf of EPP without the authorization of Plaintiff;

d.  Violation of 18 U.S.C. § 1343 by knowingly submitting materially false information to the SBA in order to increase SBA COVID-19 PPP loan payouts (including "double-dipping" by Count I Defendants receiving additional PPP loans related to EPP services that were already collected by EPP);

e.  Violation of 18 U.S.C. § 1343 by knowingly accepting SBA COVID-19 EIDL grant payouts based upon providing materially false information (including "double-dipping" by Count I Defendants receiving additional EIDL grants related to services that were already collected by EPP);

f.  Violation of 18 U.S.C. § 1343 by knowingly accepting SBA COVID-19 EIDL loans based upon providing materially false information (including "double-dipping" by Count I Defendants receiving additional EIDL loans related to services that were already collected by EPP);

g.  Violation of 18 U.S.C. § 1343 by transferring government loan money from EPP operating accounts to non-EPP operating accounts;

h.  Violation of 18 U.S.C § 1343 by knowingly submitting false information to the USPTO to usurp Plaintiff's intellectual property;

i.  Violation of 18 U.S.C. § 1343 by knowingly maintaining an online *TJS* store under the EPP brand to fraudulently induce sales, which actually enrich CARTER, LAURIE, NOYA, MNL, and NNL.

244.    The acts of wire fraud, self-dealing, fraudulent transfers, misuse of the corporate form, and financial and loan fraud set forth above constitute a pattern and/or racketeering activity pursuant to 18 U.S.C. § 1961(5).

245.    The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

246.    As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in that:

  a.  Plaintiff has been wrongfully dissociated from the company he co-founded, EPP;

  b.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his equity in EPP;

  c.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his business and personal property, including: two (2) twin-sets of vintage first-class Boeing 747 seats and the *TJS* set;

  d.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property, including: SAVVY STEWS, THE JET SET, and other trademarks and content that he created or co-created at EPP;

  e.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property *The Aluminum Lady* videos;

  f.  Plaintiff has been deprived of the ownership, custody, and control of his SAVVY STEWS and GAILEN DAVID Facebook pages and JETIQUETTE Twitter account;

g.  Plaintiff has been continuously defamed and attacked by the Count 1 Defendants in an effort to silence him in such a way that it is impacting his ability to make a living.

247.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count I Defendants as follows: payment of his minimum $500,000.00 equity stake in EPP, return of his business, personal, and intellectual property and social media accounts, injunctive relief enjoining the Count I Defendants from defaming him, including taking down the GDF website and other defamatory Internet postings, other actual damages known and unknown, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

## COUNT II:
## VIOLATION OF RICO ACT – 18 U.S.C. § 1962(a)
(As to All Defendants)

248.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 247 as if fully set forth within.

249.    EPP is an enterprise engaged in and whose activities affect interstate commerce.

250.    Specifically, EPP is in the business of selling television and other content and other goods and services to nationwide networks and markets.

251.    All Count II Defendants are employed by and/or otherwise associated with the EPP enterprise.

252.    OIM is an enterprise engaged in and whose activities affect interstate commerce.

253.    Specifically, OIM is in the business of selling television and other content and goods and services to nationwide networks and markets.

254.    All Count II Defendants are employed by and/or otherwise associated with the OIM enterprise.

255.    DEVIANT is an enterprise engaged in and whose activities affect interstate commerce.

256.    Specifically, DEVIANT is in the business of cinematography, videotaping, and providing and selling other goods and services related to the pornography industry to nationwide networks and markets.

257.    All Count II Defendants are employed by and/or otherwise associated with the DEVIANT enterprise.

258.    GORGON is an enterprise engaged in and whose activities affect interstate commerce.

259.    Specifically, GORGON is in the business of providing court reporting and other goods and services to nationwide networks and markets.

260.    All Count II Defendants are employed by and/or otherwise associated with the GORGON enterprise.

261.    MNL is an enterprise engaged in and whose activities affect interstate commerce.

262.    Specifically, MNL is in the business of selling television and other content and goods and services to nationwide networks and markets.

263.    All Count II Defendants are employed by and/or otherwise associated with the MNL enterprise.

264.    NNL is an enterprise engaged in and whose activities affect interstate commerce.

265.    Specifically, NNL is in the business of providing fitness, health, and wellness advice, services, and products to nationwide networks and markets.

266.    All Count II Defendants are employed by and/or otherwise associated with the NNL enterprise.

267.    PBS is an enterprise engaged in and whose activities affect interstate commerce.

268.    Specifically, PBS in the business of providing auditing, accounting, financial, and tax preparation services and advise to nationwide networks and markets.

269.    All Count II Defendants are employed by and/or otherwise associated with the PBS enterprise.

270.    The Count II Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.  Specifically, the Count II Defendants:

a.    Do business all throughout the United States and the globe, have corporations they founded in California, Delaware, Florida, Maryland, Michigan, and Nevada, and which have operations in Virginia;

b.    Have used and invested embezzled EPP assets in interstate commerce;

c.    Have used and invested SBA COVID-19 disaster loans and grants obtained by materially false representations to the federal government (including funds obtained by "double-dipping" as discussed in Count I);

d.    Have converted, used, and invested equity, personal, business, and intellectual property in EPP belonging to Plaintiff;

e.    Derive income and value from the fraudulently converted, obtained, and embezzled funds and assets of EPP on an ongoing basis;

f.    Have used multiple banks and accounts to move money received by EPP, and subsequently transferred out of EPP, in order to conceal its destination and eventual use;

g. Have made bank and wire transfers of the embezzled funds and fraudulently obtained SBA COVID-19 Disaster Relief funds to third-parties that do not have a business interest or relationship with EPP; and

h. Have made materially false statements to the USPTO and general public to usurp the value of Plaintiff's intellectual property.

271. The wrongful payments, wire fraud, fraudulent transfer of EPP funds and assets out of EPP and EPP accounts, and fraud on the SBA, USPTO, and general public, and investment and use of the funds and assets constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(5).

272. As direct and primate result of the Count II Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in his business and property in that:

a. Plaintiff has been wrongfully dissociated from the company he co-founded, EPP;

b. Plaintiff has been deprived of the ownership, custody, and beneficial use of his equity in EPP;

c. Plaintiff has been deprived of the ownership, custody, and beneficial use of his business and personal property, including: two (2) twin-sets of vintage first-class Boeing 747 seats and the *TJS* set;

d. Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property: SAVVY STEWS, THE JET SET, and other trademarks and content that he created or co-created at EPP;

e. Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property *The Aluminum Lady* videos;

     f.   Plaintiff has been deprived of the ownership, custody, and control of his SAVVY STEWS and GAILEN DAVID Facebook pages and JETIQUETTE Twitter account;

     g.   Plaintiff has been continuously defamed and attacked by the Count II Defendants in an effort to silence him in such a way that it is impacting his ability to make a living.

273.     WHEREFORE, Plaintiff requests that this Court enter judgment against the Count II Defendants as follows: payment of his minimum $500,000.00 equity stake in EPP, return of his business, personal, and intellectual property and social media accounts, injunctive relief enjoining the Count I Defendants from defaming him, including taking down the GDF website and other defamatory Internet postings, other actual damages known and unknown, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

**COUNT III:**
**VIOLATION OF RICO ACT – 18 U.S.C. § 1962(b)**
(As to All Defendants)

274.     Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 273 as if fully set forth within.

275.     EPP is an enterprise engaged in and whose activities affect interstate commerce.

276.     Specifically, EPP is in the business of selling television and other content and other goods and services to nationwide networks and markets.

277.     All Count III Defendants are employed by and/or otherwise associated with the EPP enterprise.

278.     OIM is an enterprise engaged in and whose activities affect interstate commerce.

279.    Specifically, OIM is in the business of selling television and other content and goods and services to nationwide networks and markets.

280.    All Count III Defendants are employed by and/or otherwise associated with the OIM enterprise.

281.    DEVIANT is an enterprise engaged in and whose activities affect interstate commerce.

282.    Specifically, DEVIANT is in the business of cinematography, videotaping, and providing and selling other goods and services related to the pornography industry to nationwide networks and markets.

283.    All Count III Defendants are employed by and/or otherwise associated with the DEVIANT enterprise.

284.    GORGON is an enterprise engaged in and whose activities affect interstate commerce.

285.    Specifically, GORGON is in the business of providing court reporting and other goods and services to nationwide networks and markets.

286.    All Count III Defendants are employed by and/or otherwise associated with the GORGON enterprise.

287.    MNL is an enterprise engaged in and whose activities affect interstate commerce.

288.    Specifically, MNL is in the business of selling television and other content and goods and services to nationwide networks and markets.

289.    All Count III Defendants are employed by and/or otherwise associated with the MNL enterprise.

290.    NNL is an enterprise engaged in and whose activities affect interstate commerce.

291.    Specifically, NNL is in the business of providing fitness, health, and wellness advice, services, and products to nationwide networks and markets.

292.    All Count III Defendants are employed by and/or otherwise associated with the NNL enterprise.

293.    PBS is an enterprise engaged in and whose activities affect interstate commerce.

294.    Specifically, PBS in the business of providing auditing, accounting, financial, and tax preparation services and advise to nationwide networks and markets.

295.    All Count III Defendants are employed by and/or otherwise associated with the PBS enterprise.

296.    The Count III Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering.  Specifically, the Count III Defendants:

    a.    Hid EPP bank documents and financial reports from Plaintiff to conceal their financial wrongdoing and prevent Plaintiff from blowing the whistle at their illegal activities;

    b.    Locked Plaintiff out of EPP, including all EPP bank and electronic accounts, a business he co-founded, when he persisted in his insistence on seeing banking and financial statements;

    c.    Deprived Plaintiff of his ownership stake and membership in EPP in order to further conceal their wrongdoing.

    d.    Publicly and privately defamed Plaintiff to conceal their own wrongdoing.

297.    Count III Defendants' refusal to allow the Plaintiff to review the banking and financial documents, their wrongful separation of Plaintiff from his business and equity, the

deprival of Plaintiff's ownership stake in EPP, and defaming Plaintiff to conceal their illegal activities constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

298.    The Count III Defendant(s) have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

299.    As a direct and proximate result of the Count III Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in his business and property in that:

    a.  Plaintiff has been wrongfully dissociated from the company he co-founded, EPP;

    b.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his equity in EPP;

    c.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his business and personal property, including: two (2) twin-sets of vintage first-class Boeing 747 seats and the *TJS* set;

    d.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property: SAVVY STEWS, THE JET SET, and other trademarks and content that he created or co-created at EPP;

    e.  Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property *The Aluminum Lady* videos;

    f.  Plaintiff has been deprived of the ownership, custody, and control of his SAVVY STEWS and GAILEN DAVID Facebook pages and JETIQUETTE Twitter account;

g. Plaintiff has been continuously defamed and attacked by the Count III Defendants in an effort to silence him in such a way that it is impacting his ability to make a living.

300. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count III Defendants as follows: payment of his minimum $500,000.00 equity stake in EPP, return of his business, personal, and intellectual property and social media accounts, injunctive relief enjoining the Count I Defendants from defaming him, including taking down the GDF website and other defamatory Internet postings, other actual damages known and unknown, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

## COUNT IV:
## VIOLATION OF RICO ACT – 18 U.S.C. § 1962(d)
### (As to All Defendants)

301. Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 301 as if fully set forth within.

302. EPP is an enterprise engaged in and whose activities affect interstate commerce.

303. Specifically, EPP is in the business of selling television and other content and other goods and services to nationwide networks and markets.

304. All Count IV Defendants are employed by and/or otherwise associated with the EPP enterprise.

305. OIM is an enterprise engaged in and whose activities affect interstate commerce.

306. Specifically, OIM is in the business of selling television and other content and goods and services to nationwide networks and markets.

307.    All Count IV Defendants are employed by and/or otherwise associated with the OIM enterprise.

308.    DEVIANT is an enterprise engaged in and whose activities affect interstate commerce.

309.    Specifically, DEVIANT is in the business of cinematography, videotaping, and providing and selling other goods and services related to the pornography industry to nationwide networks and markets.

310.    All Count IV Defendants are employed by and/or otherwise associated with the DEVIANT enterprise.

311.    GORGON is an enterprise engaged in and whose activities affect interstate commerce.

312.    Specifically, GORGON is in the business of providing court reporting and other goods and services to nationwide networks and markets.

313.    All Count IV Defendants are employed by and/or otherwise associated with the GORGON enterprise.

314.    MNL is an enterprise engaged in and whose activities affect interstate commerce.

315.    Specifically, MNL is in the business of selling television and other content and goods and services to nationwide networks and markets.

316.    All Count IV Defendants are employed by and/or otherwise associated with the MNL enterprise.

317.    NNL is an enterprise engaged in and whose activities affect interstate commerce.

318.    Specifically, NNL is in the business of providing fitness, health, and wellness advice, services, and products to nationwide networks and markets.

319.    All Count IV Defendants are employed by and/or otherwise associated with the NNL enterprise.

320.    PBS is an enterprise engaged in and whose activities affect interstate commerce.

321.    Specifically, PBS in the business of providing auditing, accounting, financial, and tax preparation services and advise to nationwide networks and markets.

322.    All Count IV Defendants are employed by and/or otherwise associated with the PBS enterprise.

323.    As set forth above, the Count IV Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c).  Specifically, the Count IV Defendants:

    a.   Agreed to wrongfully disassociate Plaintiff from EPP;

    b.   Agreed to wrongfully dissolve Plaintiff's equity in EPP;

    c.   Agreed to commit computer crimes in order to gain private information about Plaintiff to use against him;

    d.   Agreed to defame Plaintiff through false statements and illegally obtained private information to conceal their wrongdoing;

    e.   Agreed to submit applications to the SBA which they knew included materially false information in an attempt to receive free public money, and larger sums of money than for which they were qualified;

    f.   Accepted the fraudulently obtained SBA money by wire transfer;

    g.   Agreed to fraudulently transfer money out of EPP;

    h.   Agreed to fraudulently transfer intellectual property and other non-liquid assets to which they were not entitled from EPP;

     i.   Hid bank documents and financial reports from Plaintiff to conceal their financial wrongdoing and to prevent Plaintiff from blowing the whistle on their malfeasance;

     j.   Locked Plaintiff out of EPP banking and electronic accounts, a business he co-founded, when he persisted in his insistence on seeing banking and financial statements;

     k.   Deprived Plaintiff of his equity, ownership and membership stakes in EPP in order to further conceal their wrongdoing;

     l.   Stole the Plaintiff's business, personal property, and intellectual property and converted it for OIM and personal use.

324.    The Count IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Court IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation 18 U.S.C. § 1962(d).

325.    As direct and proximate result of the Count IV Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property in that:

     a.   Plaintiff has been wrongfully dissociated from the company he co-founded, EPP;

b.   Plaintiff has been deprived of the ownership, custody, and beneficial use of his equity in EPP;

c.   Plaintiff has been deprived of the ownership, custody, and beneficial use of his business and personal property, including: two (2) twin-sets of vintage first-class Boeing 747 seats and the *TJS* set;

d.   Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property: SAVVY STEWS, THE JET SET, and other trademarks and content that he created or co-created at EPP;

e.   Plaintiff has been deprived of the ownership, custody, and beneficial use of his intellectual property *The Aluminum Lady* videos;

f.   Plaintiff has been deprived of the ownership, custody, and control of his SAVVY STEWS and GAILEN DAVID Facebook pages and JETIQUETTE Twitter account;

g.   Plaintiff has been continuously defamed and attacked by the Count IV Defendants in an effort to silence him in such a way that it is impacting his ability to make a living.

326.   WHEREFORE, Plaintiff requests that this Court enter judgment against the Count IV Defendants as follows: payment of his minimum $500,000.00 equity stake in EPP, return of his business, personal, and intellectual property and social media accounts, injunctive relief enjoining the Count I Defendants from defaming him, including taking down the GDF website and other defamatory Internet postings, other actual damages known and unknown, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

**COUNT V:**
**VIOLATIONS OF STORED COMMUNICATIONS ACT**
**(18. U.S.C. §§ 2701, *et seq.*)**
(As to CARTER, EPP, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

327.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 326 as if fully set forth within.

328.    The Stored Communications Act (hereinafter "SCA") sets forth the punishment for whomever "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such a system." 18 U.S.C. § 2701(a).

329.    Pursuant to 18 U.S.C. § 2707,  private cause of action exists for persons injured by a violation of the SCA.

330.    The Fourth Circuit has previously held that unauthorized access of previously opened and delivered emails fall within the scope of § 2701.  *Hately v. Watts*, 917 F.3d 770, 798 (4th Cir. 2019).

331.    CARTER, EPP, LAURIE, NOYA, MÀRQUEZ, and JOHN DOES 1 and 2 knowingly and intentionally accessed electronically stored emails, including delivered and opened emails, from DAVID's EPP email account, as well as other public-facing social media accounts, and used the information thereby gathered to defame DAVID and discredit the serious allegations levelled against them.

332.    Defendants did not have authority to access DAVID's corporate email account or his social media accounts, nor authority to remove private communications and privileged medical records from said accounts.

333.    DAVID's reputation has been seriously harmed by the Defendant's violation of §

2701.

334.    In addition, DAVID has suffered severe mental anguish and/or emotional distress

for which he has required medical treatment and therapy.

335.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count

V Defendants as follows: issue an injunction ordering Defendants to take down the GDF website

and all defamatory Internet postings, return access to Plaintiff's social media accounts

(including, the GAILEN DAVID Facebook page, the JETIQUETTE Twitter page, and the

SAVVY STEWS Facebook page), such preliminary and other equitable or declaratory relief as

may be appropriate, punitive damages, attorneys' fees and other litigation costs, and any other

relief that this Court deems appropriate.

### COUNT VI:
### VIOLATIONS OF COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. §§ 1030, *et seq.*)
(As to EPP, CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

336.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 335 as if

fully set forth within.

337.    Pursuant to Computer Fraud and Abuse Act (hereinafter "CFAA"), the intentional

access of a computer without authorization, or in excess of authorized access, to obtain

information from any protected computer is prohibited. 18 U.S.C. § 1030(a)(2)(C).

338.    Pursuant to 18 U.S.C. § 1030(e)(5)(B) and (C), it is prohibited to intentionally

access a protected computer without authorization and recklessly cause damages and loss.

339.    The computers storing the data associated with DAVID's corporate email and

social media accounts are "protected computers" as they are used in or otherwise affect interstate

commerce and communications. 18 U.S.C. § 1030(e)(2).

340.    A private right of action exists for any person who suffers damage or loss by reason of a violation of the CFAA, provided that one of several enumerated factors are present. 18 U.S.C. § 1030(g).

341.    Among the enumerated factors for civil recovery are: (1) "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" and (2) "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals . . . ."  18 U.S.C. § 1030(c)(4)(A)(i)(I)-(II).

342.    The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damages assessment, and restoring . . . the system . . . to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

343.    Defendants did not have authority to access DAVID's corporate email or social media accounts, nor authority to remove private communications and privileged medical records from said accounts.

344.    Defendants' unauthorized access and disclosure of Plaintiff's accounts injured Plaintiff's reputation and business.

345.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VI Defendants as follows: issue an injunction ordering Defendants to take down the GDF website and all defamatory Internet postings, return access to Plaintiff's social media accounts (including, the GAILEN DAVID Facebook page, the JETIQUETTE Twitter page, and the SAVVY STEWS Facebook page), such preliminary and other equitable or declaratory relief as

may be appropriate, punitive damages, attorneys' fees and other litigation costs, and any other relief that this Court deems appropriate.

**COUNT VII:**
**COMPUTER FRAUD UNDER THE VIRGINIA COMPUTER CRIMES ACT**
**(Virginia Code §§ 18.2-152.1, *et seq.*)**
(As to EPP, CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

346.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 345 as if fully set forth within.

347.    Pursuant to Virginia Computer Crimes Act (hereinafter "VCCA"), Va. Code § 18.2-152.1 *et seq.*, any person whose property or person is injured by a provision of the Act "may sue therefor and recover for any damages sustained and the costs of the suit."  Va. Code § 18.2-152.12(A).

348.    Pursuant to Va. Code § 18.2-152.3, "[a]ny person who uses a computer or computer network, without authority, and obtains property or services by false pretenses . . . [or] converts the property of another is guilty of the crime of computer fraud."

349.    Defendants did not have authority to access DAVID's corporate email or social media accounts, nor authority to remove private communications and privileged medical records from said accounts.

350.    Defendants stole and used DAVID's passwords to access DAVID's corporate email and social media accounts, by false pretenses, to obtain DAVID's property, including emails, files, graphics, and images.

351.    Defendants published DAVID's emails and other personal documents and communications in an effort to defame DAVID and harm his reputation.

352.    DAVID has incurred substantial damages and costs, as alleged herein, related to investigating and responding to Defendants' offenses, has suffered severe mental anguish and/or emotional distress, and other consequential damages.

353.    The Virginia Computer Crimes Act treats consequential damages as falling within the scope of the statutory language of "all damages."  *A.V. v. iParadigms, LLC*, 562 F.3d 630, 647 (2009).

354.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VII Defendants as follows: issue an injunction ordering Defendants to take down the GDF website and all defamatory Internet postings, return access to Plaintiff's social media accounts (including, the GAILEN DAVID Facebook page, the JETIQUETTE Twitter page, and the SAVVY STEWS Facebook page), such preliminary and other equitable or declaratory relief as may be appropriate, punitive damages, attorneys' fees and other litigation costs, and any other relief that this Court deems appropriate.

**COUNT VIII:**
**COMPUTER TRESPASS UNDER THE VIRGINIA COMPUTER CRIMES ACT**
**(Virginia Code §§ 18.2-152.1, *et seq.*)**
(As to EPP, CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

355.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 354 as if fully set forth within.

356.    Pursuant to Va. Code § 18.2-152.4, it is unlawful to "remove [] or otherwise disable any computer data . . . from a computer or computer network."  It is also unlawful for a person to use a computer to "make . . . an unauthorized copy, in any form, . . . of computer data."

357.    Defendants did not have authority to access DAVID's corporate email and social media accounts, nor authority to remove private communications and privileged medical records from said accounts.

358.    Defendants unlawfully made unauthorized copies of DAVID's personal emails and privileged medical records when Defendants researched and copied emails and information from those accounts to use to publicly ridicule DAVID and defame his reputation.

359.    As alleged above, DAVID has suffered injuries and incurred damages as result of Defendant's actions and conduct for which Defendants are liable pursuant to Va. Code § 18.2-152.3 and Plaintiff is entitled to recover the costs of this suit.

360.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VIII Defendants as follows: issue an injunction ordering Defendants to take down the GDF website and all defamatory Internet postings, return access to Plaintiff's social media accounts (including, the GAILEN DAVID Facebook page, the JETIQUETTE Twitter page, and the SAVVY STEWS Facebook page), such preliminary and other equitable or declaratory relief as may be appropriate, punitive damages, attorneys' fees and other litigation costs, and any other relief that this Court deems appropriate.

## COUNT IX:
## INVASION OF PRIVACY UNDER THE VIRGINIA COMPUTER CRIMES ACT
### (Virginia Code §§ 18.2-152.1, *et seq.*)
### (As to EPP, CARTER, LAURIE, MARQUEZ, NOYA, and JOHN DOES 1 and 2)

361.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 360 as if fully set forth within.

362.    Pursuant to Va. Code § 18.2-152.5, it is unlawful to use a computer or computer network, without authorization, to intentionally examine "any employment, salary, credit, or any other financial or identifying information . . . relating to any other person."

363.    Plaintiff did not give authorization to the Defendants to access DAVID's corporate email and social media accounts.

364.     DAVID's corporate email account contained private financial and medical information, as well as username and password information regarding various accounts, which the Count IX Defendants used to hijack Plaintiff's social media accounts to spread defamatory information about Plaintiff.

365.     As alleged above, DAVID has suffered injuries and incurred damages as a result of Defendants' actions and conduct for which the Defendants are liable pursuant to Va. Code § 18.2-152.3.

366.     WHEREFORE, Plaintiff requests that this Court enter judgment against the Count IX Defendants as follows: issue an injunction ordering Defendants to take down the GDF website and all defamatory Internet postings, return access to Plaintiff's social media accounts (including, the GAILEN DAVID Facebook page, the JETIQUETTE Twitter page, and the SAVVY STEWS Facebook page), such preliminary and other equitable or declaratory relief as may be appropriate, punitive damages, attorneys' fees and other litigation costs, and any other relief that this Court deems appropriate.

**COUNT X:**
**WRONGFUL DISSOCIATION & FAILURE TO COMPENSATE**
(As to EPP, CARTER, LAURIE, NOYA, and OIM)

367.     Plaintiff repeats and alleges every allegation set forth in paragraphs 1–366 as if fully set forth within.

368.     Plaintiff maintains that he still has a 25% Member-Manager ownership stake in EPP and is entitled to his share of the business.

369.     Plaintiff was wrongfully refused access to EPP's books by CARTER, LAURIE, and NOYA.

370.    Defendants CARTER, LAURIE, NOYA, and OIM fraudulently transferred assets from EPP to OIM to avoid liability for the obligation to the Plaintiff for his share of EPP when he was wrongfully locked out of EPP.

371.    Plaintiff was not compensated for his equity stake in EPP, in which he retains an ownership interest, nor was his business, personal, or intellectual property returned to him, including 2 twins sets of Boeing 747 vintage first-class seats and the set currently used to film *TJS*.

372.    As discussed *supra* and *infra*, the Count X Defendants have also conspired to steal Plaintiff's intellectual property rights in SAVVY STEWS and THE JET SET.

373.    Plaintiff is also entitled to any OIM profits stemming from *TJS*, *TTS*, *TAL,* and any related merchandise or other offerings stolen by the Count X Defendants from EPP.

374.    Plaintiff additionally alleges that Plaintiff is entitled to any offset in attorney's fees accrued by EPP and OIM in defending this suit and the Florida suit, including the attorney's fees and damages paid out to State Farm (currently, $10,000), or fines imposed by the federal government as a result of the Defendants' racketeering and COVID-19 disaster relief fraud, that would diminish his ownership share.

375.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count X Defendants as follows: payment of his minimum $500,000 equity stake in EPP, the return of business, personal, and intellectual property, other actual damages known and unknown, punitive damages, attorneys' fees, and any other relief that this Court deems appropriate.

**COUNT XI:**
**TRADEMARK INFRINGEMENT (THE '536 TRADEMARK)**
(As to MNL and LAURIE)

376.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1-375 as if fully set forth within.

377.    Plaintiff created and co-owns the '536 trademark.

378.    LAURIE under the banner of MNL, filed a trademark for SAVVY STEWS on May 11, 2020, notably claiming a use-in-commerce date nearly nine (9) years prior to the application date after his role in locking Plaintiff out of EPP.  Ex. T.

379.    Adding insult to injury, LAURIE and MNL used Plaintiff's likeness in the specimen, without Plaintiff's permission, in the process of working to steal Plaintiff's intellectual property.  *Id.*

380.    The USPTO issued the '536 trademark to MNL for SAVVY STEWS on May 25, 2021.

381.    Plaintiff instituted cancellation proceeding 92,078,662 with the USPTO's TTAB on December 16, 2021 on the grounds that: (1) registrant is not the rightful owner of mark for identified goods or services pursuant to Trademark Act Sections 14(1) and 1; (2) there is a false suggestion of a connection with persons, living or dead, institutions, beliefs, or national symbols, or to bring them into contempt, or disrepute pursuant to Trademark Act Sections 14(3) and 2(a); (3) the registration is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used pursuant to Trademark Act Section 14(3); (4) the registration consists of or comprises a name, portrait, or signature of a deceased president without the written consent of the surviving spouse pursuant to Trademark Act Sections 14(1) and 2(c); and (5) fraud on the USPTO pursuant to

Trademark Act Section 14(3); *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009).  Ex. U.

382.    WHEREFORE, Plaintiff requests that this Court take over jurisdiction of this cancellation proceeding currently before TTAB under federal question jurisdiction and enter judgment against the Count XI Defendants according to the relief claimed in the proceeding institution, as well his share of all payments collected by the Count XI Defendants by use of the trademark, actual damages known and unknown, punitive damages, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

## COUNT XII:
## TRADEMARK INFRINGMENT (THE '163 TRADEMARK)
(As to EPP, OIM, CARTER, LAURIE, and NOYA)

383.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–382 as if fully set forth within.

384.    Plaintiff created and co-owns the TJS trademark.

385.    Plaintiff co-founded EPP to produce the show associated TJS trademark.

386.    CARTER, LAURIE, and NOYA subsequently locked Plaintiff out of EPP, but kept custody of the Plaintiff's trademark, THE JET SET.

387.    LAURIE, with assent of CARTER and NOYA, as "President" of EPP, filed a trademark application for THE JET SET on May 27, 2020, notably claiming a use-in-commerce date nearly (6) years prior to the application.  Ex. V.

388.    USPTO issued the '163 trademark to EPP for THE JET SET on December 29, 2020.

389.    According to the CARTER, LAURIE, NOYA, and OIM, EPP, with LAURIE's signature, and CARTER and NOYA's assent assigned the disputed trademark to OIM in

consideration for non-assignable SBA COVID-19 EIDL debt[18,19] on January 23, 2021. *See* Ex. W.

390.    Interestingly, the Trademark Assignment Cover Sheet filed with the USPTO states that the reason for the assignment was due to a "name change," and not an assignment or conveyance. *Id.*

391.    Defendants CARTER, LAURIE, NOYA, and OIM have consistently held that EPP no longer does business as of October 19, 2020, despite EPP's debt obligations to the SBA.[20]

392.    Defendants CARTER, LAURIE, and NOYA have also consistently held that EPP and OIM and are two separate entities and have allegedly even closed all of EPP's bank accounts.

393.    Plaintiff is unaware of any name change documents filed with any secretaries of state changing the name of EPP to OIM.

394.    Additionally, CARTER, LAURIE, and NOYA, in violation of EPP's obligation to SBA COVID-19 debt,[21] have intentionally allowed EPP's good standing to lapse with the Nevada Secretary of State.  Ex. X.

395.    Plaintiff instituted cancellation proceeding 92,078,743 on December 24, 2021 on the grounds that: (1) registrant is not the rightful owner of mark for identified goods or services pursuant to Trademark Act Sections 14(1) and 1; (2) the registration is deceptive pursuant to Trademark Act Sections 14(3) and 29(a); (3) the registration is being used by, or with the

---

[18] The SBA loans are discussed *infra* in detail.
[19] *See* Ex. EE (containing SBA Form 1391 which is issued with all SBA Economic Injury Disaster Loans (hereinafter "EIDL"), and which prohibits borrowers from assigning any SBA debts without prior approval from the SBA)).
[20] *See* Ex. EE (requiring borrowers to maintain good standing during the duration of the EIDL loan term).
[21] *Id.*

permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used pursuant to Trademark Act Section 14(3); and (4) fraud on the USPTO pursuant to Trademark Act Section 14(3); *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009).  Ex. Y.

396.    WHEREFORE, Plaintiff requests that this Court take over jurisdiction of this cancellation proceeding currently before TTAB under federal question jurisdiction and enter judgment against the Count XII Defendants according to the relief claimed in the proceeding institution, as well his share of all payments collected by the Count XII Defendants by use of the trademark, actual damages known and unknown, punitive damages, treble damages, attorneys' fees, and any other relief that this Court deems appropriate.

## COUNT XIII:
## BREACH OF CONTRACT
### (As to EPP)

397.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–396 as if fully set forth within.

398.    Plaintiff and Defendant EPP, CARTER, LAURIE, and NOYA agreed to and ratified an Operating Agreement to govern the affairs of EPP and regulate the relationship between the members.

399.    Under this Agreement, Defendant EPP incurred a duty to treat DAVID with good faith and a duty to deal with him fairly.

400.    Defendants also incurred a duty to help the Plaintiff in the performance of his EPP responsibilities.

401.    Defendants breached this agreement by wrongfully locking Plaintiff out of EPP and denying him access to company resources, making it impossible to fulfill his ownership obligations.

402.    Defendants breached their duty of good faith and fair-dealing, including their duty to avoid hindering the Plaintiff in the performance of his duties, for instance, by deliberately scheduling taping events in ways that interfered with Plaintiff's schedule and plans.

403.    Defendants breached these same duties by refusing to answer or concealing answers to Plaintiff's questions regarding the finances of EPP.

404.    Finally, Defendants breached their duty because they locked Plaintiff out of EPP in order to conceal financial malfeasance on the part of the company and its other members.

405.    Plaintiff's original salary was $62,000.00 a year, which was subsequently reduced to $42,000.00 a year.

406.    As a result of the Defendants wrongful actions, Plaintiff has been deprived of the benefit of his salary and ownership equity, business, personal, and intellectual property and social media accounts since his lock-out on March 7, 2020.

407.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Defendants for payment of his minimum $500,000.00 equity stake in EPP, the return of his business, personal, and intellectual property, other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

**COUNT XIV:**
**BREACH OF FIDUCIARY DUTY**
(As to EPP, CARTER, LAURIE, and NOYA)

408.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–407 as if fully set forth within.

409. Defendants EPP, LAURIE, CARTER, and NOYA owed Plaintiff a fiduciary duty due to his status as a member with equity in EPP.

410. Defendants EPP, LAURIE, CARTER, and NOYA breached that duty by engaging in multiple bad faith actions. Specifically,

    a. Defendants refused to allow Plaintiff access to the banking and other financial records;

    b. Defendants conspired to hide financial misfeasance and malfeasance from the Plaintiff;

    c. Defendants used their access to Plaintiff's email and social media accounts to locate private communications they could release to embarrass, defame, and oppress the Plaintiff;

    d. Defendants released and advertised private communications and medical forms they found using their access to Plaintiff's email and social media accounts to embarrass, defame, and oppress the Plaintiff;

411. Plaintiff has been injured by the Defendants' breach of their fiduciary duty.

412. WHEREFORE, Plaintiff requests that this Court enter judgment against the Defendants for payment of his minimum $500,000.00 equity stake in EPP, of no less than $100,000.00 compensation for the damage done to Plaintiff as a result of the Defendants' breach of the fiduciary duty they owed to Plaintiff, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

**COUNT XV:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
(As to All Defendants)

413.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–412 as if fully set forth within.

414.    Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach.  *St. Paul Fire & Marine Ins. Co. v. Hoskins*, 2012 U.S. Dist. LEXIS 30770, at *14-16 (W.D. Va. Mar. 7, 2012).

415.    The Count XV Defendants knew of Plaintiff's stated demand to view the financial and banking information of EPP.

416.    The Count XV Defendants knew that EPP and its members owed Plaintiff a fiduciary duty and knew that Plaintiff was entitled to view the Withheld Records by legal right.

417.    The Count XV Defendants knew that denying Plaintiff access to the banking and financial records, concealing financial malfeasance, violation of Plaintiff's privacy, and the publication and advertisement of Plaintiff's private communications and privileged medical records was a violation of the fiduciary duty that EPP and Defendant Members owed Plaintiff.

418.    Despite so knowing, the Count XV Defendants participated in and/or manifested their assent to the Defendants' breach of their fiduciary duty to Plaintiff.

419.    Plaintiff has been harmed by the Defendants' aiding and abetting the breach of the fiduciary duty EPP and Defendant Members owed to Plaintiff.

420.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Defendants of no less than $100,000.00 compensation for the damage done to Plaintiff as a result of the Defendants' aiding and abetting a breach of the fiduciary duty owed to Plaintiff, as well as

other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

**COUNT XVI:**
**WILLFUL AND MALICIOUS COMBINATION AND CONSPIRACY TO INJURE PLAINTIFF'S REPUTATION, TRADE, BUSINESS OR PROFESSION**
(As to all DEFENDANTS)

421.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–420 as if fully set forth within.

422.    Plaintiff alleges that the Count XVI Defendants combined together to injure Plaintiff's trade or business.

423.    Plaintiff alleges that the Count XVI Defendants, in their combination to injure his trade or business, used unlawful means to achieve an unlawful end.

424.    Plaintiff alleges that the Count XVI Defendants acted intentionally, purposefully, and without lawful justification to pursue the unlawful end of Plaintiff's lock-out of EPP from without payment of any compensation for his membership interest or return of his business, personal, and intellectual property and social media accounts.

425.    Defendants' conspiracy has harmed Plaintiff in his current occupation, that is, as a labor organizer, who needs the trust and goodwill of those whom he is trying to help unionize.

426.    Potential members of the union refuse to associate with Plaintiff because of the Defendants' conspiracy.

427.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count XVI Defendants for $300,000.00 in compensatory damages for the damage the conspiracy has done to Plaintiff's reputation and his business interests, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

## COUNT XVII:
## FRAUDULENT TRANSFER
### (Virginia Code §§ 55.1-400, *et seq.*)
#### (As to EPP, OIM, CARTER, LAURIE, and NOYA)

428.     Plaintiff repeats and alleges every allegation set forth in paragraphs 1–427 as if fully set forth within.

429.     A presumption of fraudulent conveyance arises when badges of fraud are proven. *See e.g., Hutcheson v. Savings Bank of Richmond,* 129 Va. 281 (1921).

430.     The badges of fraud relevant to the instant action are: (a) retention of interest in Plaintiff's transferred property by the Defendants to OIM; (b) pursuit of the Defendants or threat of litigation by Plaintiff at the time of transfer; (c) lack of or gross inadequacy of consideration for the conveyance; (d) retention or possession of the property by OIM; and (e) fraudulent incurrence of indebtedness after the conveyance.

431.     Upon information and belief, Defendant EPP transferred the '163 trademark and all other EPP assets and property to OIM without consideration.

432.     Upon information and belief, Plaintiff immediately made known his intention to insist on his legal rights after his lockout, thereby giving Defendants EPP, NOYA, CARTER, and LAURIE notice of potential litigation against them (and not to mention that the Defendants has already sued Plaintiff).

433.     In order to protect the assets of EPP from the Plaintiff's legal enforcement, CARTER, LAURIE, and NOYA transferred EPP's assets to OIM.

434.     Defendants have admitted that EPP did not receive any consideration for the transfer of its assets to OIM except for the promise of payment on a non-assignable debt incurred at the time of the fraudulent transfer.

435.    Upon information and belief, OIM and its members continue using all assets transferred to OIM in the exact same manner as they used them at EPP to produce the same content.

436.    Proof of a single badge of fraud may be sufficient to stamp a transaction as fraudulent, and here there are several of said badges.

437.    As Defendants' transfer of assets from EPP to OIM was fraudulent, Plaintiff requests that the Court void the transfers from EPP to OIM so that the title to said assets will return to EPP.

438.    WHEREFORE, Plaintiff requests that this Court void the transfer from EPP to OIM of any and all financial assets, movable property, and intellectual property, and enjoin their use until their final disposition can be addressed, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

### COUNT XVIII:
### LIBEL AND DEFAMATION
(As to EPP, CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

439.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–438 as if fully set forth within.

440.    Defendants created the GDF website in which they have created pages of content designed to portray Plaintiff in a false light and defame him. *See e.g.*, Ex. AA.

441.    The Defendants published the defamation and libel about the Plaintiff on both the GDF webpage and by and through the Plaintiff's own social media accounts. *See e.g.*, Ex. AA–DD, FF–GG.

442.    The defamatory and libelous statements are malicious and intended to harm the Plaintiff both personally and professionally.

443.    The Defendants knew that the statements they were publishing were false.

444.    The defamatory and libelous statements made by the Defendants were not opinions, nor offered as such.

445.    The Count XVIII Defendants defamed the Plaintiff on the GDF site in the following ways:

a.    Falsely asserting that Plaintiff is a serial liar (*see e.g.*, Ex. AA–DD, FF–GG);

b.    Falsely asserting that Plaintiff makes up stories to manipulate people into giving him what he wants (*see e.g.*, Ex. CC);

c.    Falsely asserting that Plaintiff is a spendthrift or otherwise not a trustworthy person, especially with money (*see e.g.*, Ex. BB);

d.    Falsely asserting that Plaintiff admitted to committing perjury (*see e.g.*, Ex. BB);

e.    Falsely asserting that Plaintiff filed a false police report (*see e.g.*, Ex. BB); and,

f.    Falsely asserting that Plaintiff is a grifter and confidence man who is exploiting his core audience for his sole benefit (*see e.g.*, Ex. BB and CC).

446.    To substantiate the above defamatory statements, the Count XVIII Defendants published private communications, court documents, and misappropriated information from Plaintiff's EPP and social media accounts to create the illusion the Count XVIII Defendants' defamations were substantiated, thus increasing their defamatory power.

447.    In social media, the Count XVIII Defendants defamed the Plaintiff in the following ways:

a. On Facebook, the Count XVIII Defendants published Plaintiff's privileged medical forms gained by wrongfully accessing the Plaintiff's email (*see e.g.*, Ex. DD, FF, and GG);

b. On Facebook, the Count XVIII Defendants defamed as Plaintiff as mentally unstable (*see e.g.*, Ex. GG);

c. On Facebook, the Count XVIII Defendants defamed the Plaintiff as a serial liar and confidence man who "fabricates stories to fit [his] narrative . . ." (*see e.g.*, Ex. CC); and,

d. On Facebook, the Count XVIII Defendants defamed Plaintiff as a liar who misuses the Court system to hurt people (*see e.g.*, Ex. AA).

448.    MÁRQUEZ republished the defamatory website and adopted its statements on at least two occasions on both Facebook and Instagram.  *See e.g.*, Ex. HH.

449.    Even though the Plaintiff is a labor organizer, a social media influencer, and a former cast member of *TJS*, the Plaintiff is a private person and is entitled to be protected from malicious libel and defamation.

450.    The Plaintiff uses his knowledge and reputation to effect change and bring about awareness of issues in the travel industry, and the Defendants' continued sabotage of the Plaintiff's reputation decreases his effectiveness as an advocate for workers in the travel industry and other causes he champions.

451.    The types of defamatory and libelous comments that have been made and that continue to be on display on the Internet rise to the level of defamation and libel *per se*.

452.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count XVIII Defendants in the amount of $300,000.00 for the damage done to Plaintiff's reputation

and business expectancies. The Plaintiff also requests that this Court enter an order enjoining the Defendants to remove the GDF website and all other defamatory postings from the Internet, an order enjoining the Defendants from speaking or publishing anything regarding the Plaintiff publicly, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

**COUNT XIX:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
(As to CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

453.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–452 as if fully set forth within.

454.    Intention infliction of emotional distress "has four elements that must be proved: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Almy v. Grisham*, 273 Va. 68, 77 (2007).

455.    The Plaintiff has suffered from anxiety and depression, including social anxiety, because of the above-referenced events.

456.    At all times prior to the Defendants' defamatory Internet postings, Plaintiff was a charismatic advocate of flight attendants and air travel issues.

457.    Plaintiff is a businessman who has had an active and a regular presence, not just on *TJS*, but in other mediums, such as the Internet, regarding these issues.

458.    After the Defendants' efforts to maliciously harm not only his personal reputation, but his businesses, his business reputation, and professional associations, the Plaintiff has experienced anxiety and depression.

459.    The Plaintiff has eschewed opportunities that would cause him to have a public presence and has pulled back from public engagements and advocating for his causes, out of apprehension that his character and presence will merit unwanted and unwarranted attack by the Defendants.

460.    The Plaintiff worries that his now-vulnerable reputation, due to the actions of the Defendants, could present a liability for his businesses, his associates and partners, as well as the people he advocates for, to the extent that he has become hesitant to participate.

461.    The Plaintiff has suffered loss of sleep, anxiety, and depression as part of the Defendants' continued cruel behavior, defamation, and libel.

462.    Because of the relationship between the Plaintiff and the Defendants, namely CARTER, LAURIE, MÁRQUEZ, and NOYA, the Defendants knew or should know of the Plaintiff's health issues.

463.    The Defendants' conduct is intentional and reckless and intended to harm the Plaintiff.

464.    The Defendants' conduct, namely improperly removing him from EPP and refusing to allow him to continue his association with *TJS*, and more importantly, the Defendants' decisions to create the GDF website and hijack the Plaintiff's social media sites to impersonate and defame Plaintiff, was outrageous and intolerable.

465.    The Plaintiff has suffered both professional set-backs and losses, as well as personal and professional embarrassment and harm.

466.    The Defendants' actions are a direct cause of the Plaintiff's worsened anxiety and depression.

467.    The Plaintiff's emotional distress, caused by the actions of the Defendants, remains severe.

468.    The Plaintiff's emotional distress continues, primarily due to the refusal of the Defendants to remove the GDF website and return control of the Plaintiff's social media accounts to the Plaintiff.

469.    Each day the GDF website remains active and readily available for continued defamation and libel of the Plaintiff and his business enterprises, the Plaintiff suffers additional emotional distress.

470.    WHEREFORE, the Plaintiff requests that this Court enter judgment against the Defendants for $300,000.00 in compensatory damages for his distress, as well as $50,000.00 to reimburse Plaintiff's medical and therapy bills, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

**COUNT XX:**
**INJUNCTIVE RELIEF**
**(Virginia Code §18.2-500)**
(As to CARTER, LAURIE, MÁRQUEZ, NOYA, and JOHN DOES 1 and 2)

471.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1–470 as if fully set forth within.

472.    Pursuant to Virginia Code §18.2-500, the Plaintiff is entitled to injunctive relief requiring the Defendants to remove the GDF webpage, return the Plaintiff's social media sites, to-wit: JETIQUETTE Twitter handle, Plaintiff's GAILEN DAVID Facebook page, and SS's Facebook page, and other social media accounts.

473.    The continued control of the social media sites by the Defendants creates a harm both to the Plaintiff personally and professionally, as well as to his businesses.

474.    The harm the continued defamatory and libelous content inflicts on the Plaintiff and his businesses cannot be fully compensated by compensatory damages.

475.    Each day the defamatory content remains on the Internet, the irreparable harm to the Plaintiff and his companies continues, and no adequate remedy in the law exists.

476.    Plaintiff is currently employed as a labor organizer attempting to help flight attendants unionize.

477.    Defendants' defamatory statements online sow distrust, causing people to reject Plaintiffs' attempts to help organize flight attendants.

478.    The Plaintiff has a strong likelihood of being successful on the merits of his case.

479.    Additionally, pursuant to Virginia Code §8.01-620, because of the damages caused by the Defendants' continued malicious control of the Plaintiff's social media sites and the defamatory GDF website, the Plaintiff is entitled to injunctive relief.

480.    The damages caused by the Defendants' actions is so egregious that there is not adequate remedy, in the way of financial damages, that will compensate the loss of reputation, both personally and professionally, as long as the website and social media sites remain in the control of the Defendants, with their continued intent to harm the Plaintiff and his businesses.

481.    Finally, the Plaintiff would ask for the full extent of the damages, both compensatory and injunctive, allowed by §18.2-500 and §8.01-620 of the Code of Virginia.

482.    WHEREFORE, Plaintiff requests that this Court enter an order enjoining the Defendants to remove the GDF website and all other defamatory postings from the Internet, an order enjoining the Defendants from speaking or publishing anything regarding the Plaintiff publicly, and enjoining them to return the business, personal, and intellectual property they wrongfully withheld from Plaintiff, including, the two (2) twin-sets of vintage Boeing 747 first-

class seats, and Plaintiff's GAILEN DAVID, JETIQUETTE, and SAVVY STEWS social media accounts.

**COUNT XXI:**
**MEMBERS' APPLICATION FOR INJUNCTION AND APPOINTMENT OF**
**RECEIVER WHEN COMPANY MISMANAGED**
**(NRS § 86.5415)**
(As to EPP)

483.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 - 482 as if fully set forth herein.

484.    EPP is organized under the laws of Nevada.

485.    Plaintiff owns a twenty-five percent (25%) stake in the equity of EPP.

486.    As such, he has the right to bring an action against the controllers of the company "whenever irreparable injury to company is threatened or being suffered" and "[i]ts managers and managing members have been guilty of fraud or collusion or gross mismanagement in the conduct or control of its affairs . . . ."  NRS § 86.5415.

487.    Plaintiff alleges such fraud, collusion, and gross mismanagement in the conduct and control of the affairs of EPP.

488.    Plaintiff alleges that EPP and the Defendant Members do not follow the corporate form because they do not follow EPP's operating agreement, nor do they keep meeting minutes, appoint officers, maintain basic financial controls, or have written policies or best practices to ensure that the company meets its legal and ethical responsibilities.

489.    Plaintiff also has the basis to ask for an injunction and receiver when "the company has dissolved but has not proceeded diligently to wind up its affairs, or to distribute its assets in a reasonable time."

490.    Plaintiff alleges that Defendants CARTER, LAURIE, and NOYA, have effectively tried to dissolve EPP, by attempting to drain it of all of its assets and equity, but have kept it in existence without assets as a pass-through entity and shell for their actual company OIM, and as a farce for the illegally obtained SBA COVID-19 Disaster Relief funds.

491.    WHEREFORE, Plaintiff requests that the Court appoint a Receiver, at the expense of the Defendants, to oversee EPP to prevent the Defendants from causing any more injury to or further prejudicing the rights of the Plaintiff.

**COUNT XXII:**
**APPOINTMENT OF RECEIVER *PENDITE LITE***
**(Del. Ch. Ct. R. 149)**
(As to OIM)

492.    Plaintiff repeats and alleges every allegation set forth in paragraphs 1 – 491 as if fully set forth herein.

493.    Defendant OIM is organized under the laws of Delaware.

494.    The Court of Chancery, upon application of verified complaint, and where there is an urgent need for immediate protection against injury either in the course of actual infliction or reasonably to be apprehended, and where there is something more than a possibility of danger and loss to justify the court in exercising the unusual and extraordinary power of appointing a receiver.  Del. Ch. Ct. R. 149.

495.    OIM's continued beneficial use of converted EPP assets, business, personal, and intellectual property is an ongoing injury to the Plaintiff, who holds a property interest therein, and which, absent chancery intervention, is likely to continue.

496.    OIM's continued beneficial use of Plaintiff's movable property is an ongoing injury to the Plaintiff which is also likely to continue absent chancery intervention.

497.    The contentious nature of this litigation and the personal animosity of the Defendants against the Plaintiff also militates in favor of granting a Receiver *Pendente Lite* for prudential concerns regarding the smooth application of justice and equity.

498.    WHEREFORE, Plaintiff requests that the Court appoint a Receiver *Pendite Lite*, at Defendants' expense, to oversee OIM to prevent the Defendants from causing any more injury to or further prejudicing the rights of the Plaintiff.

**COUNT XXIII:**
**CONVERSION**
(As to LAURIE)

499.    Plaintiff repeats and alleges every allegation set for in paragraphs 1–498 as if fully set forth herein.

500.    Plaintiff created and maintained the *AL* "YouTube" page, in which he made parody videos in aid of his advocacy efforts for flight attendants.

501.    These *AL* videos were the sole property and creation of the Plaintiff.

502.    While working with LAURIE, the Plaintiff provided access to the *AL* "YouTube" page to LAURIE to aid in administration.

503.    LAURIE admitted to purposefully and maliciously deleting all videos from the *AL* "YouTube" page.

504.    LAURIE admitted to doing so out of spite and anger with Plaintiff occasioned by the instant dispute.

505.    LAURIE had no right to the videos, they were not his property, and he took them to deprive the Plaintiff of their beneficial use, and thereby wrongfully assumed the right of ownership over the *AL* videos.

506.    LAURIE admitted to storing the episodes deleted from the page on a private server over which he has custody or control.

507.    WHEREFORE, Plaintiff requests an order enjoining the Defendant to return all *AL* videos wrongfully removed from the *AL* "YouTube" account, as well as a judgment in the amount of the revenue lost as a result of its conversion as established by the average monthly income at *AL*, no less than $100,000.00, as well as other actual damages known and unknown, punitive damages, attorneys' fees, court costs, and any other relief that this Court deems appropriate.

## **CONCLUSION**

**WHEREFORE**, Defendants having injured the Plaintiff in committing the following improper and illegal acts, namely:

- Violation of the Racketeer Influenced and Corrupt Organization Laws (18 U.S.C. § 1962(a)-(d);

- Violation of the Stored Communications Act (18 U.S.C. §§ 2701, *et seq.*);

- Violation of the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030, *et seq.*);

- Computer Trespass and Fraud, which are violations of the Virginia Computer Crimes Act (Virginia Code §§ 18.2-152.1, *et seq.*);

- Invasion of Privacy under the Virginia Computer Crimes Act (Virginia Code §§ 18.2-152.1, *et seq.*);

- Wrongful Dissociation and Failure to Compensate Plaintiff pursuant to his ownership interest in EPP;

- Infringement of Plaintiff's Trademarks and Fraudulent Statements made to the United States Patent and Trademark Office;

- Defendants' Breach of Contract with Plaintiff;

- Defendants' Breach of Fiduciary duty to Plaintiff, and aiding and abetting the same;

- Defendants' civil conspiracy to violate the duties Defendants owed to Plaintiff as well as violate the Plaintiff's rights as a stakeholder and his rights under the Operating Agreement;

- Fraudulently transferring liquid assets, movable property, and intellectual property from EPP to avoid any judgment Plaintiff might win against Defendants;

- The incessant and ongoing character assassination of Plaintiff by means of the Internet, where Defendants have posted libelous and defamatory statements on their social media, official company websites, and a stand-alone website solely dedicated to the purpose of harming Plaintiff's reputation;

- Defendants' harassment and malicious defamation of Plaintiff has caused him significant emotional and mental harm requiring medical assistance;

- Defendant's refusal to follow the requirements of the corporate form and maintain accessible books and financial statements, keep meeting minutes, appoint officers, and, generally, their failure to properly govern or steward EPP, as well as the frauds they have perpetrated under its name;

- Defendant's refusal to follow the requirements of the corporate form and maintain accessible books and financial statements, keep meeting minutes, appoint officers, and, generally, their failure to properly govern or steward OIM, as well as the frauds perpetrated under its name; and,

- Defendants' conversion of Plaintiff's *AL* videos.

In response thereto and for his remedy, Plaintiff demands the following:

- $500,000.00 for the value of his ownership in equity of EPP;

- An order enjoining the United States Patent and Trademark office to restore ownership of the '163 and '536 trademarks to Plaintiff;

- Expectation damages no less than $100,000.00 for lost revenue from Plaintiff's ownership interest in EPP;

- Damages no less than $100,000.00 for the damage done to Plaintiff as a result of the Defendants breach of their fiduciary duty to Plaintiff for aiding and abetting same;

- $300,000.00 for the damage to Plaintiff's reputation, trade, business, and profession;

- An Order avoiding the transfer from EPP to OIM of any and all financial assets, movable property, and intellectual property;

- An Order enjoining the Defendants from publishing the GDF website and to remove all defamatory Internet postings regarding the Plaintiff;

- An Order enjoining the Defendants from speaking publicly about Plaintiff;

- $50,000.00 to cover Plaintiff's medical and therapy bills, as well as recompense Plaintiff for the emotional and physical toll Defendants' intentional conduct caused him;

- An Order enjoining the Defendants to return the personal, movable property they wrongfully withheld from Plaintiff, including the two (2) twin-set vintage first-class Boeing 747 seats and Plaintiff's GAILEN DAVID, JETIQUETTE, and SAVVY STEWS social media accounts;

- An Order appointing a receiver to oversee EPP to prevent the Defendants from causing any more injury to or further prejudicing the rights of the Plaintiff;

- An Order appointing a receiver to oversee OIM to prevent the Defendants from causing any more injury to or further prejudicing the rights of the Plaintiff;

- An Order enjoining the Defendants to return all *AL* videos they wrongfully removed from the *AL* "YouTube" account as well as a judgement in the amount of the revenue lost as a result of its conversion as established by the average monthly income at *AL*, no less than $100,000.00;

- Treble damages;

- Punitive damages;

- Reasonable Attorney's Fees and Court Costs;

- Any other equitable or legal relief that the Court sees fit to grant.

**Respectfully submitted this 17th day of March, 2022.**

_____/s/Charisse L. Hines_____
Charisse L. Hines, Esq. (Va. Bar # 86354)
Thomas F. Ranieri, Esq.  (Va. Bar # 93150)
950 North Washington Street, Suite 223C
Alexandria, Virginia 22314
(t) 571-549-2635
(f) 571-933-4123
(e) chines@charissehineslaw.com
    tranieri@charissehineslaw.com

*Counsel for Plaintiff*

**JURY TRIAL DEMANDED**

## VERIFICATION

I, GAILEN LEE DAVID, hereby verify that the statements of fact made in this Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to civil and criminal penalties.

**Signed, this 17th day of March, 2022.**

_____
**GAILEN LEE DAVID**

## NOTARY ACKNOWLEDGEMENT

**State/Commonwealth of** _____

**County of** _MIAMI DADE_

The foregoing instrument was executed or acknowledged before me this, the _17_ day of _MARCH_ , 2022.

_____
Notary Public's Signature

Personally Known _____; OR,

Type of Identification Produced _DRIVER LICENSE_

Notary Public State of Florida
Stanley Moore
My Commission HH 044333
Expires 09/28/2024